147 F.3d 1104
 77 Fair Empl.Prac.Cas. (BNA) 188,
74 Empl. Prac. Dec. P 45,497,
98 Cal. Daily Op. Serv. 5102,
98 Daily Journal D.A.R. 7205
Kateri DRAPER, Plaintiff-Appellant,
v.
COEUR ROCHESTER, INC., Defendant-Appellee.
 No. 97-15178.
 United States Court of Appeals,
Ninth Circuit.
 Argued March 12, 1998.
Decided June 29, 1998.
 
 Mark L. Mausert, Reno, Nevada, for the plaintiff-appellant.
 Frank Cassas, Jr., Reno, Nevada, for the defendant-appellee.
 Appeal from the United States District Court for the District of Nevada Edward C. Reed, District Judge, Presiding. D.C. No. CV-N-95-737-ECR.
 Before: CANBY, and REINHARDT, Circuit Judges, and RESTANI, United States Court of International Trade Judge.*
 REINHARDT, Circuit Judge:
 
 
 1
 Kateri Draper appeals the district court's grant of summary judgment in favor of her former employer. Specifically, she challenges the district court's determination that her claims of hostile work environment, constructive discharge, and quid pro quo sexual harassment under Title VII were time-barred under the applicable limitations period. Because we conclude that genuine issues of material fact exist regarding whether the alleged hostile work environment continued into the limitations period, and because we conclude that the limitations period on Draper's cause of action for constructive discharge began to run at the time she resigned her position, we hold that summary judgment was inappropriate as to these two claims. We affirm, however, as to the claim of quid pro quo harassment.
 
 I. BACKGROUND
 
 2
 We set forth below the relevant facts in the light most favorable to Draper, as is necessary for purposes of considering an order granting summary judgment. For the same reason we assume, for purposes of this opinion, that as to all disputed facts, Draper's version is correct.
 
 
 3
 In November 1992, Kateri Draper, a Hispanic woman, began working for Coeur at its mining operation on the outskirts of Lovelock, Nevada. At the time, she was 23 years old. For the first three months of her employment, she was a temporary laborer; thereafter, she was assigned permanently to Coeur's "D" crew. Initially, her duties included shoveling dirt and snow under crusher trucks, but she soon received additional training and became a haul truck driver and crusher operator. For most of her tenure at Coeur, Draper was the only woman assigned to the "D" crew. Also on the "D" crew was Kevin Machado, a mechanic who started working at Coeur at approximately the same time as Draper. At some point during their employment at the mine, Machado and Draper began a romantic relationship and eventually became engaged to be married.
 
 
 4
 When Draper and Machado were first assigned to the "D" crew, Joe Anelli was an equipment operator on the crew with occasional supervisory duties. Approximately six months after Draper and Machado joined the crew, he assumed the role of primary crew supervisor.
 
 
 5
 Draper worked at Coeur for a period of two years. Throughout the course of her employment, Anelli made sexual remarks that caused her to feel uncomfortable and humiliated. Although Anelli's remarks were usually made directly to her when the two of them were alone, he also made frequent comments about her to coworkers outside her presence. At the outset, Anelli's comments to Draper were fairly innocuous, though perhaps inappropriate. He often inquired into her personal life and wanted to know whom she was dating. He frequently referred to her not by name, but as "beautiful" and "gorgeous."
 
 
 6
 Shortly thereafter, Anelli's comments took on a decidedly sexual tone. He told Draper, for example, that his sex life with his wife was not very good and that he wished he had met Draper before he had married. He also told Draper about his sexual fantasies, including his desire to have sex with both Draper and his wife. This conduct escalated and became more unbearable for Draper when Anelli became the crew's supervisor. During a safety meeting with the entire crew, for example, Anelli asked what a Mexican prostitute was called and joked that the answer was "a frijole." Several times he remarked about Draper's "ass" and commented to other members of the crew that "it would be fun to get into [Draper's] pants." On one occasion, the crew had been working in the rain, and when Draper went to the locker room to change out of her wet clothes, Anelli used the loudspeaker to ask whether she needed any help changing clothes and announced that several guys were willing to provide assistance. On another occasion, he walked up from behind her as she was shoveling dirt and told her to "be careful who you bend over in front of." Another time, Draper had just taken off a sweatshirt that she was wearing over her regular work shirt and Anelli asked over the loudspeaker whether that was all she was going to take off.
 
 
 7
 Anelli's behavior suggests that he treated Draper differently from her male coworkers in part because of her relationship with Machado. Perhaps out of jealousy, as Draper alleges, Anelli went to great lengths to prevent Draper and Machado from spending any time together. He refused to permit Draper to take her breaks with the rest of her crewmates, including Machado, and forced her to eat lunch with him in his office.
 
 
 8
 Draper tried to ignore Anelli's comments and his discriminatory treatment, but she felt uncomfortable, angry, and humiliated much of the time. Although she received several salary raises, she believed that Anelli gave her unfavorable work assignments. Instead of assigning her to drive the crew trucks, for example, he assigned her to shovel dirt or perform groundwork. The lack of experience driving trucks prevented her from obtaining enough experience to bid into a better job, such as that of equipment operator.
 
 
 9
 In June 1994, Draper finally complained to Coeur's management that Anelli was making improper sexual advances toward her and was treating her unfairly. Three managers were present at this meeting, including Anelli's direct supervisor, John Murphy. Draper explained that Anelli was treating her differently from her coworkers in order to prevent her from spending any time with Machado. She further told the managers that she felt that she was being sexually harassed. In response to Draper's complaints, Coeur's management met separately with both Anelli and Machado and then held a meeting with all three (Draper, Anelli, and Machado). Notwithstanding these meetings, and notwithstanding the fact that one of Draper's coworkers had cautioned management that if nothing was done to stop Anelli, Draper could probably sue for sexual harassment, Anelli persisted in his conduct and Draper continued to feel that she was not being treated fairly.
 
 
 10
 Several months later, on November 14, Draper contacted Kathy Smith, a female supervisor, and told Smith about her problems with Anelli. Smith's notes from the meeting indicate that Draper complained that "Anelli [was] not treating her equally" with respect to "working in shop, lunch breaks, breaks, Kevin Machado, personal business, diary--attitude." Smith thought Draper's complaints were sufficiently serious that she contacted another female supervisor, Julie Moore, to discuss the situation. Smith and Moore met with Anelli, and then all three of them spoke with Murphy, Anelli's supervisor. In spite of this second series of meetings, Anelli's treatment of Draper continued unabated and she continued to believe she was being treated in a discriminatory manner.
 
 
 11
 Accordingly, on December 7, Draper confronted Anelli in his office and complained that he was still harassing her; she told him that "what he was doing wasn't right." Her comments prompted him to pick up the phone and call Murphy. Anelli told Murphy that Draper was in his office "digging up old bones," and accusing him of sexually harassing her. Anelli then began to laugh. Draper perceived his laugh as derisive and mocking, and she felt frustrated and humiliated. Because she had already presented her concerns to Coeur's management, apparently to no avail, and because, despite all that had happened, Anelli still felt free to disparage her and her complaints of sexual harassment to his supervisor, Draper concluded that there was no chance that the harassment would stop or that anything would be done to alleviate the intolerable conditions. She decided at that point that she had no choice but to quit, and did so on the spot.
 
 
 12
 Draper filed a charge of sexual harassment with the Nevada Equal Rights Commission on July 5, 1995. Several months later, on September 15, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). At the end of November, having received a right-to-sue letter, she filed an action in federal district court, alleging violations of Title VII on theories of hostile work environment, constructive discharge, and quid pro quo harassment. Coeur moved for summary judgment on the following grounds: (1) Draper failed to file her Title VII claims within the 300-day limitations period, and (2) there was no triable issue of material fact as to any of her discrimination claims.
 
 
 13
 The district court granted the motion on the ground that her claims were time-barred because no act of discrimination had occurred within the applicable time period. With respect to the constructive discharge claim, it reasoned that "[t]hough the termination of [her] employment may have resulted from some act of unlawful discrimination, discharge by itself is not an 'act of discrimination' under the statute." It did not reach the defendant's second ground.
 
 
 14
 Draper appeals, contending that the discrimination and harassment of which she complains persisted up until her final day on the job, and that the district court also erred regarding the nature of a constructive discharge. In short, she argues that her claims are not time-barred.
 
 II. ANALYSIS
 
 15
 Under Title VII, a plaintiff seeking relief pursuant to the statute's provisions must file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). If, however, the plaintiff first institutes proceedings with a state or local agency "with authority to grant or seek relief from such practice," the period of limitations for filing a charge with the EEOC is extended to 300 days. Id. Draper timely filed a charge with the Nevada agency with authority to handle claims of discrimination, and therefore the limitations period applicable to her claim is 300 days.
 
 
 16
 Because the limitations period under Title VII operates as a statute of limitations, Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393-94, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), a claim of discrimination under the Act will not be sustained if it is based on an event or events that occurred more than 300 days before the filing of a charge. Like a statute of limitations, however, the limitations period contained in Title VII is "subject to waiver, estoppel, and equitable tolling." Id. at 393, 102 S.Ct. 1127. In this case, Draper filed her charge with the EEOC on September 15, 1995; accordingly, the 300-day period during which an unlawful employment practice must have occurred commenced on November 19, 1994. Coeur contends that the only event that is alleged to have occurred after that date was the incident in Anelli's office during which Draper accused him of persisting in his discriminatory and harassing treatment. According to Coeur, this event did not constitute an act of discrimination, and Draper's claims therefore fall outside the applicable period.
 
 
 17
 While Draper recognizes that most of the incidents underlying her Title VII claims occurred before November 19, she contends that (1) the general hostile work environment continued until her final day on the job; (2) her confrontation with Anelli in his office constituted a discrete act of discrimination; and (3) for statute of limitations purposes, the discriminatory act of constructive discharge occurred on the day she quit. With respect to the first two claims, she relies in part on the continuing violation doctrine, see Green v. Los Angeles County Superintendent, 883 F.2d 1472, 1475 (9th Cir.1989), under which events occurring outside the limitations period may be considered as a basis for the claim so long as those events are part of an ongoing unlawful employment practice. See also Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 572 (8th Cir.1997). Draper can avail herself of this theory by demonstrating that her claims are founded on a pattern or practice of employer conduct that continued into the relevant period of limitations.
 
 
 18
 In this case, Draper has alleged violations of Title VII based on three distinct legal theories--hostile work environment, constructive discharge, and quid pro quo harassment. Two of these claims--hostile work environment and constructive discharge--are premised in large part on the same unlawful employment practice, Anelli's persistent harassment and disparate treatment of her. The third--quid pro quo harassment--is premised upon the more specific allegation that Anelli assigned Draper to less desirable work duties because she rejected his sexual advances. We consider the allegations with respect to each theory separately, in determining whether any of the events underlying these claims occurred within the relevant period of limitations.
 
 A. Hostile Work Environment
 
 19
 The first theory under which Draper proceeds is that Coeur committed an unlawful employment practice by forcing her to work in a hostile environment. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). A "hostile work environment" occurs when there is a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Accordingly, claims that raise a genuine issue of material fact as to the existence of a hostile environment involve allegations of continuing violations. See Gipson v. KAS Snacktime Co., 83 F.3d 225, 229 (8th Cir.1996) (noting that a situation amounting to a hostile work environment is "an ongoing nightmare for the employee victim"); Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1166 (7th Cir.1996) ("Sexual harassment serious enough to constitute unlawful discrimination on grounds of sex is often a cumulative process rather than a one-time event.").
 
 
 20
 Here, Draper has testified that she was subject to the same sort of harassment by Anelli on a regular basis, and that she constantly felt uncomfortable and upset at work. As in most claims of hostile work environment harassment, the discriminatory acts were not always of a nature that could be identified individually as significant events; instead, the day-to-day harassment was primarily significant, both as a legal and as a practical matter, in its cumulative effect. Because Draper's hostile work environment claim is not based upon a series of discrete and unrelated discriminatory actions, but is instead premised upon a series of closely related similar occurrences that took place within the same general time period and stemmed from the same source, her allegations set forth a claim of a continuing violation.
 
 
 21
 It is not enough, however, that Draper has raised a genuine issue of disputed fact as to the existence of a continuing violation. In order to survive Coeur's motion for summary judgment, she must demonstrate that a genuine issue exists as to whether the violation continued into the relevant period of limitations. See Huckabay v. Moore, 142 F.3d 233, 240 (5th Cir.1998) (explaining that the continuing violation doctrine "will render a complaint timely as to a course of conduct only if the complaint is timely as to the most recent occurrence"); Gipson, 83 F.3d at 228 (stating that in the context of a continuing violation, "the statute of limitations runs from 'the last occurrence of discrimination' ") (quoting Hukkanen v. International Union of Operating Eng'rs Local 101, 3 F.3d 281, 285 (8th Cir.1993)). Specifically, she must raise a sufficient question as to whether the hostile work environment of which she complains existed on or after November 19.
 
 
 22
 Coeur contends that Draper cannot make the required showing because she has offered no facts to suggest that any incident of discriminatory behavior occurred on or after November 19.[1] We disagree with Coeur and conclude that Draper presented sufficient evidence to raise a genuine factual issue regarding whether Anelli's discriminatory conduct continued into the relevant period of limitations.
 
 
 23
 In reaching the conclusion that there was no evidence that any discriminatory act took place on or after November 19, the district court both ignored evidence offered by Draper and failed to view the occurrence in Anelli's office in the light most favorable to her. As to the ignored evidence, Draper's sworn statements provide sufficient facts from which a reasonable juror could find that she continued to be the victim of sexual harassment until the date of her constructive discharge. In particular, Draper's statement during her deposition that Anelli's conduct persisted for most of her term of employment at Coeur is, viewed properly, evidence that supports her allegation that she continued to endure sexual harassment after November 18. Draper made a similar statement in her EEOC charge of discrimination, asserting that Anelli's discriminatory behavior continued "throughout [her] employment" at the mine. Perhaps even more important, Draper stated in her deposition that the reason she confronted Anelli in his office on December 7 was that he was continuing to harass her despite her complaints to Coeur management.
 
 
 24
 In addition to ignoring Draper's statements regarding the continuing harassment, the district court also erroneously determined as a matter of law that Anelli's conduct towards Draper during their December 7 confrontation was not an act of discrimination. Coeur urges us to view the incident as an isolated event without reference to the circumstances in which it occurred. This narrow approach is inappropriate, particularly in the context of a continuing violation claim. As the Supreme Court recently acknowledged, determining what sorts of workplace behavior constitute discriminatory action that can create a hostile work environment requires "careful consideration of the social context in which particular behavior occurs and is experienced by its target ... [and it] often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Oncale v. Sundowner Offshore Servs., Inc., --- U.S. ----, ----, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). Discriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender. See Meritor Savings, 477 U.S. at 65, 106 S.Ct. 2399 (noting that employees have the "right to work in an environment free from discriminatory intimidation, ridicule, and insult").
 
 
 25
 Draper has described an occurrence that can be understood only in light of the circumstances that preceded it and the nature of the relationship that existed between Draper and her supervisor. Assuming the truthfulness of Draper's version of the facts, Anelli's snide laughter and humiliating response to her allegations of harassment could reasonably have been perceived by her as an act of hostility that was clearly related to the authority he customarily exercised over her and to his prior, as well as his future, discriminatory treatment of her. Cf. Ellison v. Brady, 924 F.2d 872, 883 n. 19 (9th Cir.1991) (observing that the mere presence of a prior harasser might create a hostile work environment for a victim of sexual harassment). Anelli's confidence that he could call his supervisor and ridicule Draper's concerns understandably suggested to Draper that his earlier meetings with Coeur's management had had no effect on Anelli's behavior, that he would continue to treat her in the same manner as before, and that the chances that management would take appropriate corrective action were slim to none. The events in Anelli's office on that day not only constituted a final hostile act by Draper's supervisor, but served as a sharp reminder to her of all that had already occurred and all that could be expected in the future.
 
 
 26
 Draper's statements regarding Anelli's persistent harassment, together with her evidence regarding the December 7 event, are, for purposes of summary judgment, sufficient to raise a genuine issue of fact as to whether the hostile work environment continued into the relevant period of limitations and, thus, whether her claim falls under the continuing violation doctrine. Accordingly, we conclude that summary judgment as to Draper's hostile work environment claim was erroneously granted.B. Constructive Discharge
 
 
 27
 Related to Draper's allegation of a hostile work environment is her claim that Anelli's conduct resulted in her constructive discharge. Like a hostile work environment claim, a claim for constructive discharge usually results from a series of discriminatory actions on the part of the employer that are in the nature of a continuing violation: A constructive discharge occurs when a person quits his job under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable. Steiner v. Showboat Operating Co., 25 F.3d 1459, 1465 (9th Cir.1994). In such cases the individual has simply had enough; she can't take it anymore. Here, Draper's quitting was precipitated by Anelli's derisive and insulting conduct on December 7, which was well within the relevant period of limitations, although her action was the result of the cumulative effect of Anelli's repeated acts of discrimination, most of which occurred prior to that period.
 
 
 28
 More important, we disagree with the district court's conclusion that the date on which a constructive discharge takes place is irrelevant for purposes of determining whether a claim is timely filed. We hold, to the contrary, that the date of discharge triggers the limitations period in a constructive discharge case, just as in all other cases of wrongful discharge. Constructive discharge is, indeed, just one form of wrongful discharge. The fact that the actual act of terminating employment is initiated by the employee, who concludes that she is compelled to leave as a result of the employer's actions, rather than by the employer directly does not change the fact that the employee has been discharged. Therefore, if the date of Draper's quitting falls within the relevant period of limitations, as it unquestionably does here, her claim is timely filed.[2]
 
 
 29
 Coeur's reliance on Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), is misplaced. In Ricks, the Supreme Court rejected as untimely a wrongful discharge claim based on allegations that the plaintiff, a college professor, had been unlawfully denied tenure. The plaintiff's discharge one year later followed automatically from the denial of tenure. In his complaint, the plaintiff did not assert that he had been discriminatorily discharged; he only alleged discrimination with respect to the denial of tenure. Id. at 257-58, 101 S.Ct. 498. Concluding that his claim was time-barred, the Court observed that the discharge was "a delayed, but inevitable, consequence of the denial of tenure," and, moreover, that there was no difference between the manner in which Ricks was terminated and the manner in which other professors who had also been denied tenure were terminated. Id. at 258, 101 S.Ct. 498.
 
 
 30
 By contrast, Draper has alleged that she was constructively discharged. Although her discharge may have been a result of Coeur's unlawful conduct, it was not a certain or inevitable consequence of the employer's actions. Unlike Ricks, in which discharge is the inexorable result of the employer's tenure denial and the plaintiff is fully aware of that fact when he receives the denial notice, constructive discharge does not follow automatically from the employer's conduct as a whole, or from any particular, identifiable act. It requires in each case an exercise of independent judgment on the part of the employee. Thus, we do not believe that Ricks is of any assistance to Coeur here.
 
 
 31
 Moreover, as the Fourth Circuit has determined, a constructive discharge is a "discriminatory act" for purposes of Ricks. Young v. National Center for Health Servs. Research, 828 F.2d 235, 237-38 (4th Cir.1987). In considering the timeliness of a complaint, that court first stated that the period of limitations runs from the date of the discriminatory act. It then concluded that while a resignation is ordinarily not a discriminatory act, when a "resignation is a constructive discharge," it is a "discriminatory 'act.' " Id. at 238.
 
 
 32
 For the reasons we have stated above, we cannot agree with the district court's conclusion that the constructive "discharge by itself is not an 'act of discrimination' under the statute." To the contrary, we hold, like the Fourth Circuit, that in constructive discharge cases periods of limitation begin to run on the date of the resignation. Therefore, we reverse the district court's grant of summary judgment as to Draper's constructive discharge claim.
 
 C. Quid Pro Quo Harassment
 
 33
 Finally, Draper alleges that Coeur violated Title VII under a theory of quid pro quo harassment. Unlike her claims for hostile work environment and constructive discharge, which by their nature tend to involve ongoing, persistent violations, her quid pro quo harassment claim appears to be based on specific, isolated acts of discriminatory conduct. As to this claim, there is no evidence from which a reasonable juror could conclude either that the alleged quid pro quo harassment constituted a continuing violation or that any act that could reasonably be characterized as quid pro quo harassment occurred within the period of limitations. Accordingly, summary judgment was proper with respect to this claim.
 
 III. CONCLUSION
 
 34
 Because genuine issues of fact exist regarding whether Anelli engaged in discriminatory conduct toward Draper within 300 days of her filing a discrimination charge with the EEOC, we conclude that summary judgment on the ground that her hostile work environment claim was time-barred was erroneous. Similarly, we conclude that the district court erred in holding that a constructive discharge does not constitute a discriminatory act and in finding that Draper's constructive discharge claim was time-barred. Given our holdings in this respect, it follows that Draper's constructive discharge claim was timely. Finally, because there was no evidence that an act of quid pro quo harassment occurred within the period of limitations, we conclude that summary judgment as to Draper's quid pro quo harassment claim was proper. Accordingly, we remand for further proceedings with respect to the claims that we have determined to be timely filed.
 
 
 35
 REVERSED in part; AFFIRMED in part.
 
 
 
 *
 Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation
 
 
 [1]
 For purposes of this opinion, we assume without deciding that Coeur is correct in its assertion that a plaintiff alleging a hostile work environment claim must demonstrate that a discrete "discriminatory act" occurred within the relevant period of limitations. Although we note that a handful of courts have assumed that such a requirement exists as to all cases arising under the continuing violations theory, see, e.g., Martin v. Nannie & The Newborns, Inc., 3 F.3d 1410, 1416 (10th Cir.1993); Waltman v. International Paper Co., 875 F.2d 468, 474-75 (5th Cir.1989), we reserve decision as to whether requiring such a showing is appropriate in the context of a hostile work environment claim, given that a hostile work environment is ambient and persistent, and that it continues to exist between overt manifestations
 
 
 [2]
 Of course, Draper retains the burden of proving that her termination was a constructive discharge--that, in the view of a reasonable person, her conditions of employment had become intolerable. The frequency and freshness of the instances of harassment may enter into that determination. If the trier of fact finds, however, that under all of the circumstances the termination was a constructive discharge, then the discharge becomes the actionable event for purposes of the 300-day limitation. Our decision determines only when the claim arose, not whether its merits have been established; in reviewing the district court's summary judgment that the claim was time-barred, we necessarily assume that Draper can prove a constructive discharge