**Aybike KORTAN, Plaintiff–Appellant,**

v.

**CALIFORNIA YOUTH AUTHORITY; Albert Atesalp; I.R. Schulman; Manual Carbajal, Defendants–Appellees.**

No. 98–56047.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 2000

Filed July 7, 2000

---

Peter R. Dion–Kindem, Los Angeles, California, for the plaintiff-appellant.

David M. Tiede, Deputy Attorney General, San Diego, California, for the defendants-appellees.

Before: RYMER and FISHER, Circuit Judges, and GEORGE, Senior District Judge.[*]

RYMER, Circuit Judge:

Aybike Kortan, a Clinical Staff Psychologist for the State of California Department of Youth Authority (CYA), appeals the summary judgment entered in CYA's favor on her action under 42 U.S.C. § 2000e alleging hostile work environment, retaliation, and gender discrimination. In a published opinion, the district court declined to consider evidence of harassment not mentioned in the complaint or in Kortan's charge with the California Department of Fair Employment and Housing; and held that a negative evaluation (after Kortan complained about her supervisor's conduct), unaccompanied by any other adverse impact such as a demotion or change of responsibilities, is insufficient to allow a retaliation claim to go forward. *Kortan v. State of California,* 5 F.Supp.2d 843

(C.D.Cal.1998). While an opinion published after the district court's decision, *Anderson v. Reno,* 190 F.3d 930 (9th Cir. 1999), indicates that evidence outside the limitations period should be considered at least as relevant background, it does not affect the result here. As we otherwise agree that no triable issues are raised, we affirm.

## I

Kortan, who is a Caucasion female, began working at the Southern Youth Reception Center and Clinic (SYCC) in June 1988 as a Clinical Staff Psychologist. On June 29, 1989, her supervisor, Dr. Albert Atesalp, appointed Kortan as "acting senior psychologist" with the authority to act on his behalf in his absence. This was a special designation for which Kortan received no extra remuneration or benefits. On January 26, 1994, she was honored as Outstanding Employee of the Year. Kortan had no complaints about Atesalp's behavior until February 1994.

On February 1, she left instructions with the nursing staff that a ward who had been admitted to the hospital was not to be discharged back into the general population without her approval, but the next day discovered that her instructions had been torn up and the ward had been returned. Kortan believed that Nurse Chavez was responsible and reported this to Atesalp. Atesalp did not seem to Kortan to take her problem seriously. On February 3, Kortan wrote Atesalp that she no longer wanted to be "acting senior" in his absence, stating that "for the past 5 years, I have been acting in your capacity when you are absent. I have been trying to do my best. However, regardless of how much I try, I am unable to improve in any way how things are around here." Over coffee after Atesalp received the memo, Kortan says that he referred to one female, who was

[*] Honorable Lloyd D. George, Senior United States District Judge for the District of Neva- da, sitting by designation.

formerly a superintendent of the SRCC, as a "regina," and said that this person "laughs like a hyena." He also referred to a former assistant superintendent as a "madonna," "regina" and a "castrating bitch." In the same conversation, Atesalp referred to women generally as "bitches" and "histrionics."[2]

Sometime between February 3 and 10, Kortan complained about Atesalp's conduct to Assistant Superintendent Schulman. He seemed empathetic and encouraged Kortan to "take him [Atesalp] on." Kortan then complained to Superintendent Manual Carbajal and memorialized her charges against Atesalp in a February 10, 1994 memorandum. The memorandum details a number of difficulties, including the incident with Nurse Chavez; complaints from other psychologists that Atesalp pressured them to write reports; being called to Atesalp's office to listen to a tape by Dr. Abrams (a male psychologist on staff) whose language was shocking to Kortan and later, to read a letter Atesalp had written to Abrams that used the phrase "masturbate yourself"; and Atesalp's referring to a former Superintendent as "regina," and making racial remarks about blacks. The Office of the Superintendent forwarded Kortan's complaints together with a request for investigation to the Headquarters of the California Youth Authority in Sacramento. Brian Rivera of Internal Affairs was assigned to investigate.

After Kortan complained about Atesalp, he started to give her "the looks" and to stare at her instead of smiling, as he had before. Atesalp told Kortan that "All this time, I assumed you were 'Artemis' ... I made a mistake, and you are not 'Artemis.' You are 'Medea.'" She also heard him laughing outside her door, saying "Yeah, she got me on sexual harassment charges. Ha. Ha."

Meanwhile, Kortan was concerned about having an upcoming evaluation conducted by Atesalp. She asked that her supervision be transferred from Atesalp to Dr. Pastrana, the Senior Psychologist of the Marshall program. However, that program was separate from the diagnostic program in which Kortan was working and was fully staffed with clinical psychologists at the time. Consequently, Atesalp did the evaluation. He rated Kortan's performance as "E" ("performance consistently exceeds expected standards") in five of the eight areas of evaluation and "I" ("improvement needed to meet expected standards") in three areas: work habits, relationships with people, and meeting work commitments. These were the lowest overall evaluations Kortan had received, although she had received an "M" ("performance fully meets expected standards") in the "work habits" section on her 1989 evaluation. To avoid any perception of retaliation, Schulman independently reviewed Atesalp's evaluation of Kortan; because he did not believe that Atesalp's initial evaluation was completely accurate, and felt there was retaliation, he changed the three low ratings to "M." He explained that he could not give Kortan higher ratings because she had been on vacation or leave for a significant part of the evaluation period (between May and August 1993), and the maintenance staff had complained about how she treated them. Both Kortan and Atesalp refused to sign the evaluation. Only Schulman's evaluation (signed April 26) ended up in Kortan's personnel file.

On March 11 Schulman instructed Atesalp to conduct business with Kortan so there could be no perception of retaliation or harassment. On March 22, after reviewing Atesalp's initial performance evaluation, Schulman told him to stop any type of behavior that might be perceived as retaliatory or harassing. He also forward-

---

2. Also in February of 1994, Atesalp made derogatory comments about two blacks which were offensive to Kortan. She originally sued on account of these remarks as well, but has not appealed dismissal of claims based on racial discrimination.

ed information about Atesalp's possibly retaliatory conduct to Rivera.

Kortan asked Schulman for a temporary transfer to the Ventura facilty, but Schulman had no discretion to effect such a transfer. When Kortan inquired of Vivian Crawford, the Superintendent of the Ventura facility, regarding a position, she was told there was none available but that her letter would be kept on file. Kortan also indicated to Rivera that she would like to change offices, as hers was located next to Atesalp's. Alternatives were discussed with her and her office was eventually moved in September.

Rivera completed his report May 7, 1994; he found the charges of harassment in Kortan's February 10 memorandum unsubstantiated. Kortan was advised of CYA's conclusion that there was no evidence of sexual harassment on October 5, 1994. Her last day of work was October 24, and she was hospitalized the next day. Since then, Kortan has been on leave of absence.

Kortan filed charges with the EEOC on October 31, 1994. She claimed that starting February 2, 1994, Atesalp created a hostile work environment by using racist and sexist terminology, and that after complaining about his conduct she was given a lowered performance rating, had a temporary transfer request denied, and had been threatened with disciplinary action if she spoke about the allegations. She received a right to sue letter in September 1996, and filed this action December 6, 1996.

CYA moved for summary judgment, which the district court granted. Kortan timely appeals.

## II

Kortan makes two arguments with respect to her hostile work environment claim. First, she argues that there is a triable issue as to the existence of a hostile work environment; and second, she asserts that the district court's decision to grant summary judgment was based in large part on its decision not to consider evidence of Atesalp's actions occurring during the four to five months prior to February 3, 1994.

### A

██ The pre-February 3, 1994 evidence Kortan proffered consists of her declaration that beginning in late 1993 and continuing into 1994, Atesalp used gender derogatory language in her presence, including referring to various staff members as a "castrating bitch," "Madonna," and "regina." [3] Kortan also states that Atesalp referred to her as "Rapunzel" and "Medea" and wrote postcards to her at home. Asked at her deposition about Atesalp's use of terms such as "Madonna" or "castrating bitch," Kortan indicated that prior to February 3, 1994 he did so "[v]ery infrequently," "[p]robably once or twice" in the case of the term "castrating bitch." Also, once, in talking about his license, he described a woman who interviewed him as "histrionic."

The district court did not consider this evidence because Kortan expressly limited the onset of the allegedly harassing incidents to February 1994 in her complaint, her EEOC charges,[4] and her deposi-

---

3. Apparently Atesalp told Kortan that a Georgia O'Keefe poster she had in her office was "suggestive." When Kortan asked what he meant, he said "I will not say it because I'll be in trouble." Then he said: "I'll say it this way, it reminds me of a 'regina.'" Kortan replied: "Oh, you have a dirty mind."

4. The EEOC charge, filed October 31, 1994, alleges that "[s]tarting February 2, 1994, my supervisor, Doctor Atesalp, created a hostile work environment by using racist and sexist

terminology in my presence." In the attached Affidavit, Kortan avers that "[i]n early February of 1994 my immediate supervisor, Dr. Atesalp, began to make verbal comments in my presence that were both racist and sexist. I have heard him refer ... to females as 'bitches', 'Madonnas' 'casterating bitches'. 'Regina' and 'histronic' these are just examples, he has used many negative terms to describe both females and Blacks." [sic.]

tion.[5] Kortan submits that this was wrong under our opinion in *EEOC v. Farmer Bros.*, 31 F.3d 891, 899 (9th Cir.1994), because Atesalp's prior actions were "like and reasonably related" to her allegations of harassment occurring after February 3, 1994, and would have been within the scope of a reasonably thorough EEOC investigation.

In *Farmer*, the employer decided to reduce the number of women employed in production jobs and to accomplish this by a gender neutral lay-off followed by rehires that would be mostly male. The plaintiff raised a discriminatory layoff claim in her federal complaint, which Farmer Bros. sought to have dismissed for failure to exhaust administrative remedies on the ground that she had not included the layoff claim (as compared with a failure to rehire claim) in the charges filed with the EEOC. In that context we stated that the district court had subject matter jurisdiction over the lay-off claim if that claim fell within the scope of the EEOC's *actual* investigation or an " 'EEOC' investigation which *can reasonably be expected* to grow out of the charge of discrimination.' " *Id.* at 899 (quoting *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir.1990)). We went on to note that Farmer *had* included her claim of discriminatory lay-off in her EEOC charge, but even if she hadn't, it was "*necessary* for the EEOC to investigate the circumstances of [plaintiff's] layoff" in order to understand the failure to rehire. *Id.* Therefore, we held that the district court correctly exercised jurisdiction over the layoff claim. Unlike *Farmer*, here it was not "*necessary*" for the EEOC to investigate pre-February 1994 events in order to evaluate the claim Kortan actually made—that Atesalp's comments beginning in February created a hostile work environment—nor had it done so, would the investigation have revealed anything pro-

bative except for the same comments "very infrequently" made.

However, after the district court rendered its decision in this case, we addressed a somewhat similar situation in *Anderson v. Reno*, 190 F.3d 930 (9th Cir. 1999). Anderson was a veteran of the FBI who brought a Title VII action alleging sexual harassment occurring over many years. In granting summary judgment on her claim of a hostile work environment, the district court declined to consider any incident that did not occur within the statutory limitations period before the EEOC proceedings were brought. We held that the excluded incidents were part of a pattern of alleged discrimination that continued within the statutory period, and that regardless of whether "actionable in and of themselves, untimely claims serve as relevant background evidence to put timely claims in context." *Id.* at 936. Therefore, we shall consider the evidence to which Kortan points that occurred four to five months prior to February 3, 1994.

**B**

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII is violated if sexual harassment is so severe or pervasive as to create a hostile work environment. *See Montero v. AGCO Corp.*, 192 F.3d 856, 860 (9th Cir.1999); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998). "An employer is liable under Title VII for conduct giving rise to a hos-

Kortan's EEOC charge also refers to the CYA investigation, which covered the November 1993 incidents involving the Abrams tape and Altesalp letter responding to it. But Kortan does not base her hostile work environment claim on these incidents.

5. Kortan testified that before she wrote her February 3, 1994 letter, Atesalp treated her well and that she was never harassed by him until she wrote the February 3 memorandum.

tile environment where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Pavon v. Swift Trans. Co., Inc.*, 192 F.3d 902, 908 (9th Cir.1999). " 'Conduct must be extreme to amount to a change in the terms and conditions of employment.' To be actionable under Title VII, 'a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' " *Montero*, 192 F.3d at 860 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2284, 2283, 141 L.Ed.2d 662 (1998)). "[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale*, 118 S.Ct. at 1002. The motivation can be a "general hostility to the presence of women in the workplace." *Id.*

■ Courts are to determine whether an environment is sufficiently hostile or abusive by " 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Faragher*, 118 S.Ct. at 2283 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).[6]

■ There is no question that Atesalp's comments were offensive. The difficulty is that they were mainly made in a flurry on February 3rd. Once or twice before he had referred to a former female superin-

tendent as a "castrating bitch" or "madonna" or "regina," but Kortan did not regard this as harassing and she thought Atesalp behaved like a "perfect gentleman" prior to February 3. He used "regina" again on February 9. As unpleasant as Atesalp's outburst was, the comments were about other people. He never directed a sexual insult at Kortan. He also told her, on or after February 3, that she wasn't Artemis as he had previously thought but Medea. Even so, Atesalp's utterances were just offensive. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (mere utterance of epithet which engenders offensive feelings would not affect conditions of employment to sufficiently significant degree necessary for violation of Title VII).

Kortan argues that whether a reasonable woman would have found Atesalp's action hostile or abusive was an issue of fact for the jury to decide. She points to *EEOC v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir.1989), where we affirmed the district court's findings and conclusions following a bench trial that repeated vulgarities, sexual remarks, and requests for sexual favors by a hotel employee subjected female maids to severe and pervasive sexual harassment that seriously tainted the working environment and altered the terms and conditions of their employment. Among other things, the chief of engineering (Nusbaum) told a pregnant maid "that's what you get for sleeping without your underwear," asked her why she was pregnant by another man, and made comments about her "ass." Nusbaum regularly offered to give another maid money and an apartment to live in if she would "give him [her] body"; he assured her she would never be fired if she would have sex with him; and he told another

6. Recent Supreme Court opinions (rendered after the district court's decision) have discussed an employer's vicarious liability for a hostile work environment, and have recognized the availability of an affirmative defense in certain circumstances. *See, e.g., Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Since we hold that Kortan has failed to establish a prima facie case of hostile work environment, we do not address the effect, if any, of these recent opinions on this case.

"You have such a fine ass. It's a nice ass to stick a nice dick into. How many dicks have you eaten?" The evidence also showed that the Executive Housekeeper merely laughed at such remarks and herself called one of the maids a "dog," "whore" and "slut."

However offensive his language, Atesalp's conduct is not so severe or pervasive as Nusbaum's in *Hacienda Hotel.* Although Kortan urges that improper conduct does not have to rise to the level of that present in *Hacienda Hotel* to be actionable, other cases in which a hostile work environment has been found to exist are also quite different. *Anderson* is a good example. Anderson was an FBI agent who "endured a host of sexually harassing incidents between 1986 and 1994," including being referred to by her supervisor as the "office sex goddess," "sexy," "gorgeous," and "the good little girl" instead of by name; at a presentation she was to make about an arrest plan, finding an easel with a drawing of a pair of breasts and the words, "Operation Cupcake," and being told by the supervisor in front of the assembled group "This is your training bra session"; receiving various vulgar notes including a cartoon depicting varieties of female breasts with her initials next to an example labeled "cranberries"; and being patted on the buttocks by another agent, who commented on her "putting on weight down there" and informed Anderson of his observations from time to time.

In *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104 (9th Cir.1998), a female employee of a mining company alleged that over a two-year period her supervisor made sexual remarks about her, in and out of her presence; frequently called her "beautiful" and "gorgeous" rather than her name; told her about his sexual fantasies, including his desire to have sex with her as well as his wife; joked that the answer to a riddle about what a Mexican prostitute was called is "frijole"; several times remarked about Draper's "ass" and com-

mented to others that "it would be fun to get into [Draper's] pants"; and on one occasion used the loudspeaker to ask whether she needed help changing clothes and said there were several guys willing to help, and on another, after Draper had taken off a sweatshirt, to ask whether that was all she was going to take off.

*Montero* further illustrates the type of conduct that gives rise to a hostile working environment. Montero was the only female employee at a parts distribution center. Over a two-year period, one supervisor called her a "butt-kiss," told Montero he was going to spank her, rested his chin on her shoulder, grabbed her arms until she said "ouch," and made crude gestures. Another supervisor grabbed his crotch while speaking with her, placed his face on her bottom, told her he had sexual dreams about her, put his hand on her chair as she sat down, tried to bite her neck, and knelt in front of her and tried to put his head between her knees. Another employee had pulled her pants up from behind by the belt loop, commented about the small size of his penis, and placed notes on her desk telling Montero to dance naked on the desk or to take off her clothes.

The conduct in this case is simply not of this order of magnitude. Considering all the circumstances, including the fact that Atesalp's offensive conduct was concentrated on one occasion, and that it occurred in the wake of a dispute about a nurse's failure to follow instructions and Kortan's telling Atesalp that she would no longer serve as "acting senior psychologist" in his absence, we conclude that no triable issue exists about whether the conduct was frequent, severe or abusive enough to interfere unreasonably with Kortan's employment.

III.

Kortan next argues that the district court ignored retaliatory actions that were taken after she complained about Atesalp's conduct, and that it applied an incorrect legal standard in determining

whether she had been the subject of an "adverse employment decision." To make out a prima facie case of retaliation, Kortan must establish "that she acted to protect her Title VII rights, that an adverse employment action was thereafter taken against her, and that a causal link exists between those two events." *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir.1994).

Kortan identifies the following as adverse employment actions:

- Atesalp's laughing and stating that Kortan "got him on sexual harassment charges";
- Atesalp's ridiculing Kortan to other employees;
- Atesalp's hostile stares;
- Atesalp's calling Kortan "Medea";
- Atesalp's falsely accusing Kortan of not submitting a work order to have her desk repaired;
- Atesalp's increased criticism of Kortan;
- Atesalp's low ratings of Kortan's performance in three categories whereas before her complaints, she had been Outstanding Employee of the Year;
- CYA's failure to respond to Kortan's requests for transfer and a different office;
- CYA's failure to investigate complaints about retaliation;
- Shulman telling her on October 24, 1994 to communicate with him rather than with CYA headquarters about complaints, and Atesalp yelling at her during the meeting;
- Constructively discharging her.

Of these, Kortan contends that being forced to take medical leave because of the stress of retaliatory actions is the most obviously "adverse" employment decision. She analogizes to *Draper,* where a woman employee who had been subjected to extreme harassment by a supervisor and had complained to management, confronted him months later about continuing harassment and was met with a response that included telling his direct supervisor that Draper was in his office "digging up old bones" and laughing. From this she could reasonably conclude that nothing was going to be done to stop the conduct. Kortan views evidence that Atesalp stood outside her door and laughed, saying "she got me on sexual harassment charges" as similar; however, unlike *Draper,* Atesalp's response was his own immediate—albeit inappropriate—reaction to her complaint. From this, it is not possible to infer either that Atesalp's conduct would continue without sanction or that Kortan had no choice but to quit. Nor can we say that the combination of incidents after Kortan lodged her complaint February 10 were such that a "reasonable person would feel that the conditions of employment have become intolerable." *Draper,* 147 F.3d at 1110. Although she claims that Atesalp ridiculed her to other employees, falsely accused her of not submitting a work order, and was hypercritical, there is no evidence showing that these things happened. Thus, at most he was less civil, stared at her in a hostile fashion, and became more critical of her performance.

██ This leaves Kortan's evaluation by Atesalp, which appraised her work as "exceeds expected standards" in five categories but was lower than average in three—and was admittedly retaliatory. However, Schulman raised the three low marks that Atesalp had given to "performance fully meets expected standards." Thus, the evaluation in Kortan's file shows that she exceeded expected standards in most categories and fully met them in the others. Kortan does not ascribe any retaliatory motive to Schulman's evaluation, which is the one that counts.

Kortan maintains that she should not be expected to show a tangible injury, relying on *Hashimoto v. Dalton,* 118 F.3d 671 (9th Cir.1997), and *Yartzoff v. Thomas,* 809 F.2d 1371 (9th Cir.1987). In *Hashimoto,* an Asian–American woman alleged that

the Department of Navy gave her a negative job reference in retaliation for filing an EEO complaint. We recognized that unlike most cases alleging retaliation where the retaliatory conduct takes the form of discharge, demotion, failure to promote, or the like, a retaliatory negative job reference does not itself inflict tangible employment harm because it requires a prospective employer's subsequent, adverse action in response to the reference to create the employment harm. Accordingly, we held that disseminating a negative job reference is a personnel action that violates Title VII even if it does not affect a decision not to hire the victim. In *Yartzoff*, an employee at an EPA research laboratory alleged that the Agency made a number of adverse employment decisions because of his pursuit of Title VII grievances in May 1979. Among them were the transfer of various job duties between August 1979 and February 1980, the issuance of a sub-average performance rating in April 1980, and the transfer of additional job duties in February 1981. We stated that "[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions' cognizable under this section." *Yartzoff*, 809 F.2d at 1376. However, neither *Hashimoto* nor *Yartzoff* rescues Kortan's claim based on *Atesalp*'s negative evaluation. The *Atesalp* evaluation was not disseminated beyond Schulman, who corrected it; and the *Schulman* evaluation was not sub-average or undeserved to the extent it was less than perfect in three of eight categories. Beyond this, Kortan was not demoted, was not stripped of work responsibilities, was not handed different or more burdensome work responsibilities, was not fired or suspended, was not denied any raises, and was not reduced in salary or in any other benefit. Thus, Kortan has not shown that her evaluation was discriminatory or retaliatory, or was such an "intolerable" act that it would force an employee to quit. *See Steiner*, 25 F.3d at 1466 (evaluation characterizing plaintiff as "acceptable" is not "intolerable"). *Com-*

*pare Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir.1990) (unfounded negative evaluations that led to denial of merit pay in evaluation constituted constructive discharge).

## IV

Finally, Kortan argues that a triable issue of fact exists whether she was discriminated against because of her sex. In order to establish a prima facie case of employment discrimination, Kortan must show that she was a member of a protected group (females); that she was adequately performing her job; and that she suffered an adverse employment action, or was treated differently from others similarly situated. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The district court properly dismissed this claim because, for reasons we have already explained, Kortan failed to show an adverse employment action.

AFFIRMED.

FISHER, Circuit Judge, dissenting in part:

I respectfully dissent from the majority's conclusion that Aybike Kortan failed to raise genuine issues of material fact regarding her retaliation and hostile working environment claims. Admittedly, this is a close case, and there is an attraction to the majority's resolution in not setting the bar for Title VII claims so low as to encourage litigation over commonplace, although objectionable, behavior in the workplace. Nonetheless, I believe that, given the particular circumstances here and that this is a ruling on summary judgment where the close call should go to the plaintiff, Kortan has met her burden for both claims and should be allowed to proceed to trial on the merits.

The significant aspect of this case that causes me to differ with the majority is the overt retaliation against Kortan by her supervisor, Atesalp—conduct that elevates

this case from a misogynist's rantings against his female colleagues into a hostile work environment for this individual subordinate. For this supervisor did more than demean with words; he used his superior position to punish Kortan with a dramatically lowered and undeserved performance evaluation that even Atesalp's supervisor, Schulman, recognized as retaliation for Kortan's complaints against Atesalp. The majority, I fear, diminishes the true nature of the hostile work environment Kortan faced by isolating the retaliatory performance review from its analysis of the work environment, notwithstanding that retaliation was a critical aspect of the totality of the circumstances we are bound to consider. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can only be determined by looking at all the circumstances."); *see also Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir.1998) ("[R]etaliation can take the form of a hostile work environment."). Although Schulman took some steps to ameliorate Atesalp's retaliatory review, Atesalp—on the undisputed record before us—remained recalcitrant and unrepentant, suffered no reprimand other than a memorandum directing him to avoid the perception of retaliation or harassment and retained his supervisory authority over Kortan. I believe Atesalp's offensive and demeaning outbursts, his humiliating treatment of Kortan and—most significantly—the undeserved, retaliatory performance review comprise a totality of circumstances sufficient to withstand summary judgment on Kortan's hostile work environment claim.

Moreover, even Schulman's revised evaluation largely relied upon Atesalp's tainted evaluation and left Kortan with the lowest performance rating of her career with the California Youth Authority ("C.Y.A.") notwithstanding her having just been awarded "Outstanding Employee of the Year" for the same time period. Thus, I believe Kortan has also raised a triable issue that even Schulman's evaluation was impermissibly tainted by retaliation.

## I. HOSTILE WORK ENVIRONMENT: THE TOTALITY OF THE CIRCUMSTANCES

The record, construed favorably to Kortan, reasonably shows the following circumstances that turned Kortan's work environment into one of gender-based hostility. Until February 1994, Kortan and Atesalp—her immediate supervisor—enjoyed a relatively congenial professional relationship in a close-knit work environment. They interacted frequently to coordinate responsibility given Kortan's special designation as acting senior psychologist in Atesalp's absence, and Atesalp occasionally turned to her as a confidant. As Kortan testified in her deposition, however, this relationship made her "a captive audience" for Atesalp's sexist remarks—and ultimately captive to his retaliation as well. Kortan on several occasions had to listen as Atesalp unburdened himself of his offensive and demeaning attitudes toward women, with particular invective for certain women who were superintendents at C.Y.A.[1] These sexist, hostile statements about others are relevant to show Kortan was subjected to a hostile work environment. *See Oncale v. Sundowner Offshore Servs. Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)

---

1. Prior to February 1994, Atesalp, referred to Crawford, a superintendent at C.Y.A., as a "regina" as well as "a castrating bitch." Atesalp had referred to Chavira, another superintendent, as a "castrating bitch" more than once and as a "madonna." The majority overlooks Atesalp's pre-February 1994 statements about Crawford when it says Kortan testified that Atesalp had used the term castrating bitch "[v]ery infrequently" and madonna "once or twice." Maj. Op. at 1108. This testimony was only referring to Atesalp's statements about Chavira. Later in her deposition, Kortan testified that Atesalp had also used these terms to refer to Crawford.

(concluding that actionable hostile work environment includes "general hostility to the presence of women in the workplace"); *Heyne v. Caruso*, 69 F.3d 1475, 1480 (9th Cir.1995) (concluding that "conduct tending to demonstrate hostility towards a certain group" is relevant to show discrimination against an employee who is a member of that group). Most offensive in Atesalp's misogynistic vocabulary was his use of certain terms to label women he held in highest contempt: "castrating bitch" and "regina," a term he let Kortan know was a double-entendre for vagina.[2] The term "regina" is not the gutter language other cases have condemned, but given its intended meaning is just as offensive to women. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1461, 1463 (9th Cir.1994) (relying on supervisor's references to women in a "derogatory fashion using sexually explicit and offensive terms," such as "dumb fucking broads" and "cunt" as evidence he created a hostile work environment); *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 964–65 (8th Cir.1993) (concluding that such "vulgar and offensive" words " 'are widely recognized as not only improper, but as intensely degrading' " and thus frequent use of such words "clearly violates Title VII" (quoting *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir.1983))); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir.1990) (holding that "pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile work environment"). Although Kortan for a time tolerated Atesalp's derogatory statements about other women, and acknowledges that as to her personally Atesalp was "a perfect gentleman," his offensive references bothered her and she objected to his use of them. Nonetheless, during the four to five month period before February 1994, Atesalp's verbal attacks on women "got worse and worse" and eventually contributed to her February 3 decision to step down from her role as acting senior psychologist.[3]

At that point, Atesalp's attitude toward Kortan plainly shifted and became hostile. In a particularly emotional outburst, Atesalp directed invective at other female colleagues and females in general that, in context, Kortan could and did reasonably understand now included her—including relegating her to the despised "regina" category. Had that been the end of it—the emotional outburst of a supervisor who felt his trusted subordinate had unfairly abandoned him—there would not be cause for invoking Title VII. But that was not the end of it. Atesalp persisted in his retaliation, committing acts of increasing severity which transform this case from mere offensive conduct into a valid hostile work environment claim.

Atesalp publicly directed his scorn against Kortan and made mockery of her sexual harassment charge outside the door of her office. Such humiliating conduct is an important factor in determining whether an employee was subjected to a hostile or abusive work environment. *See Harris*, 510 U.S. at 23, 114 S.Ct. 367. Kortan also presented evidence, which on summary judgment we must construe in her favor, that Atesalp retaliated by purposely scheduling Kortan's performance evaluation on the day Kortan was to meet with the C.Y.A.'s internal investigator and falsely accusing Kortan of not submitting a work order. Atesalp also stared and glared at her and became hypercritical of her work—prompting Schulman to admonish Atesalp to behave himself in a March 11 memorandum suggesting Atesalp was ha-

---

2. Several months prior to February 1994, Atesalp made clear to Kortan that he intended regina to mean vagina when he told her the Georgia O'Keeffe poster in her office was "suggestive" because it reminded him "of a regina."

3. Atesalp also subjected Kortan to his racist comments. He repeatedly referred to one African–American employee as a "black ape," referred to another as a "black goon" and referred generally to African–American wards as "thugs."

rassing Kortan and retaliating against her through "excessive corrections on Psychological evaluations, lack of flexibility of work hours, and documentation for minor behavior irritants." [4]

Atesalp did not back off, however. Instead he invoked his supervisory authority to retaliate against Kortan—using her annual performance review to send an unmistakable message of retribution. Thus Kortan, who had a five-year record of receiving the highest ("E") rating in all performance categories (with the exception of one "M"—an average rating—in one category in her first year), and who was awarded "Outstanding Employee of the Year" for 1993 (the evaluation period in question), dropped two levels in three categories to the substandard "I" rating in Atesalp's evaluation. Those ratings were admittedly retaliatory, as the majority recognizes.

Although Schulman partially revised Atesalp's evaluation, those revisions neither negated the hostility of the work environment nor defeat Kortan's retaliation claim. In sum, C.Y.A. management effectively ratified Atesalp's retaliation, and added to the hostility of the work environment, by failing to take any disciplinary action against him. Not surprisingly, Atesalp remained recalcitrant and refused to sign the upgraded evaluation. As the Supreme Court has observed, management's knowledge of sexual harassment and failure to take any disciplinary action "may be seen as . . . the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy." *Faragher*, 524 U.S. at 789, 118 S.Ct. 2275; *accord Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir.1995) ("Title VII does not permit employers to stand idly by once they learn that sexual harassment has oc-

curred. To do so amounts to a ratification of the prior harassment."). Faced with management's failure to punish Atesalp for his known acts of retaliation, Kortan reasonably perceived her work environment as hostile.[5]

The majority effectively insulates Atesalp's retaliatory conduct, however, first by excluding his retaliatory evaluation from its analysis of the hostile work environment and, second, by finding no actionable retaliation because Schulman's evaluation superseded Atesalp's—essentially, "no harm, no foul." I believe both grounds are in error: the totality of the circumstances, including Atesalp's retaliatory evaluation, add up to a triable case of a hostile work environment; and—as I discuss next—even Schulman's evaluation supports a separate claim of retaliation.

## II. RETALIATION BASED ON THE POOR EVALUATION

The majority accepts that Atesalp's performance evaluation was retaliatory, and recognizes that an undeserved performance evaluation is actionable under *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987). It attempts to distinguish *Yartzoff*, however, because only Schulman's "corrected" evaluation went into Kortan's personnel file, and it characterizes Schulman's evaluation as not undeserved. *See* maj. op. at 1113. I disagree with this analysis in several respects. First, although Schulman did modify Atesalp's retaliatory—and therefore undeserved—evaluation, he did not go so far as to correct it. Rather, Schulman largely relied on the retaliatory evaluation to give Kortan the lowest evaluation of her five-year career at C.Y.A., and thereby ratified Atesalp's retaliation.

As to the three undeserved ratings Atesalp gave Kortan, in the categories "rela-

---

**4.** Schulman's memo contradicts the majority's statement that "there is no evidence showing" Atesalp retaliated by becoming hypercritical of Kortan. *See* maj. op. at 1112.

**5.** Kortan had reason to be disheartened, because Schulman had initially encouraged her

to "take him [Atesalp] on," suggesting Atesalp was a known abuser who needed to be challenged. Yet when Kortan did "take him on," she was the one who suffered adverse consequences.

tionships with people," "work habits" and "meeting work commitments," Schulman merely struck a compromise between the highest ("E") rating and Atesalp's unwarranted "I" ratings—moving Kortan up one rating to "M". Schulman may have independently investigated Kortan in the "relationships with people" category, but he did not independently investigate the other two. Schulman contends he lacked a "sufficient record of her performance ... to give her anything more than 'M' ratings" in those categories because she was on evacation or leave for a significant part of the yearly evaluation period, between May and August 1993. This "justification" rings hollow given that Kortan was named "Outstanding Employee of the Year" for the same year, absences and all. Moreover, rather than allow Atesalp's punitive ratings to drag Kortan down, Schulman could have declined to rate Kortan in those two categories for want of personal knowledge, defaulted to Kortan's prior history of "E's" over the years or otherwise memorialized his uncertainty. Instead, he simply compromised and left Kortan with her lowest performance evaluation at C.Y.A. At the end of the day, Schulman's evaluation was at least as harmful to Kortan because, by failing to remove the retaliatory taint of Atesalp's evaluation, Schulman made clear to Kortan that management would not eliminate the adverse effect of Atesalp's retaliation—only lessen it.[6]

Not only does the majority decline to recognize the effect of Schulman's tainted evaluation on Kortan, it also declines to address the "chilling effect which [a supervisor's] retaliatory conduct might have on the remaining employees under his supervision." *Hashimoto v. Dalton,* 118 F.3d 671, 676 (9th Cir.1997); *accord EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1511 (9th

Cir.1989). No doubt many C.Y.A. employees observed the conflict between Atesalp and Kortan and learned that the consequence of Kortan exercising her Title VII rights was that she went from "Outstanding Employee" to a disfavored employee and became the focus of Atesalp's wrath. These employees will likely be deterred from reporting sexual harassment out of fear of retaliation by Atesalp and ending up in the same predicament as Kortan.

Because Schulman's evaluation did not cure, but effectively ratified and perpetuated the " 'deleterious effect on the exercise of [Title VII] rights,' " caused by Atesalp's evaluation, *Hashimoto,* 118 F.3d at 676 (quoting *Garcia v. Lawn,* 805 F.2d 1400, 1405 (9th Cir.1986)), I would hold that Kortan has presented sufficient evidence to defeat summary judgment on her retaliation claim.

---

**6.** The majority also seems to distinguish *Yartzoff* because Shulman's evaluation was not "subaverage." Ratings need not be subaverage, however, to constitute retaliation. Rather, it is *"undeserved* performance ratings, if proven, [that] would constitute 'adverse employment decisions' " actionable under the retaliation provision of Title VII. *Yartzoff,* 809 F.2d at 1376 (quotation marks and citation

omitted) (emphasis added); *accord Brooks v. City of San Mateo,* 214 F.3d 1082, 1094 (9th Cir.2000); *see also Steiner,* 25 F.3d at 1465 (holding that performance evaluation with only three below average ratings out of seven categories was sufficient adverse employment decision to create prima facie case of retaliation).