**Kathleen JAMAL, Plaintiff,**

v.

**WILSHIRE MANAGEMENT LEASING CORPORATION, Defendant.**

**No. CV 03–0009–RE.**

United States District Court, D. Oregon.

June 10, 2004.

*See Walsh v. Consolidated Freightways*, 278 Or. 347, 563 P.2d 1205 (1977).

Tom Steenson, Zan Tewksbury, Portland, OR, for Plaintiff.

Chris Kitchel, Clarence M. Belnavis, Kurt E. Barker, Portland, OR, for Defendant.

## OPINION AND ORDER

REDDEN, District Judge.

The matters before the court are (1) Wilshire Management Leasing Corporation's motion for summary judgment on all of Kathleen Jamal's claims; (2) Jamal's motion for summary judgment on Wilshire's counterclaim for breach of Jamal's confidentiality agreement; and (3) Wilshire's motion to strike the declarations of Pat Stoneking and Janice White that Jamal submitted in opposition to Wilshire's motion. Oral argument was held May 28, 2004.

### The Lawsuit

Jamal's first amended complaint alleges four claims:

**A. *Age Discrimination.***

Jamal alleges Wilshire violated her rights under the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a), and Or.Rev.Stat. § 659.030(1)(a) and (b).

**B. *Retaliation.***

Jamal alleges Wilshire retaliated against her in violation of the ADEA, Title VII (42 U.S.C. § 2000e), and state statutory law because she complained of age discrimination against her and race discrimination against others.

**C. *Hostile Work Environment.***

Jamal alleges she was subjected to a hostile work environment based on age discrimination in violation of the ADEA, Title VII, and state statutory law.

### D. *Wrongful Constructive Discharge.*

Jamal alleges she was constructively discharged in September 2001, in violation of her rights under state law.

### Background

Wilshire is a Portland-based loan servicing organization that manages residential and commercial assets. In October 1996, Wilshire hired Laurie Magee as manager of loan recovery, and later promoted her to vice president of its default management department.

In November 1996, Wilshire hired Jamal for the non-management position of special assets account officer in loan recovery, a subdepartment of the default management department. Jamal had extensive experience working in the financial service industry. Jamal started reporting directly to Magee shortly thereafter. Jamal was then 46 years old and Magee was 33.

A month later, in December 1996, Magee promoted plaintiff to a team lead position in loan workout (LWO) (another subdepartment within the default management department). Jamal received a $7,000 pay increase. Magee highly rated Jamal's performance in a February 1997 review. At her October 1997 annual review, Magee again highly rated Jamal's performance, and she received an additional $5,000 raise in salary.

In January 1998, Magee promoted Jamal to LWO manager. Jamal asserts in the material she filed with the court that she did an excellent job in this position, but Wilshire asserts Jamal did not perform well as a manager and as early as April 1998, Magee began expressing her concerns.[1]

In 1998, Wilshire experienced financial problems that culminated in bankruptcy for its parent company. Wilshire asserts that in October and November 1998, the problems forced it to reduce staff and reorganize several of its departments. Wilshire eliminated the LWO manager position and transferred Jamal to work as an assistant project manager, reporting to Debbie Hart, the project manager. Jamal contends the new position was not a management position—she says she did not supervise any employees again until April 2001. Wilshire says it was a management position. In any event, Jamal asserts the elimination of her position and her transfer were based on age discrimination.[2] It appears that some of the duties of an LWO manager position later may have been given to other employees during Jamal's tenure with Wilshire, but it also appears that the position itself was not reinstated until after Jamal had left Wilshire.

Jamal alleges that beginning in 1998, she began to experience age discrimination from Magee. Her numerous allegations are set out throughout this opinion.

In August 1999, Magee gave plaintiff an "acceptable" performance evaluation for the year November 1997 through November 1998.[3] Magee praised aspects of Jamal's performance, but also noted several concerns regarding Jamal's performance as a manager. In March 2000, Hart, Jam-

---

1. Jamal did admit in deposition that Magee criticized her management skills after she became LWO manager in 1998. Jamal Depo., 134:13–135–01.

2. Jamal Depo. 138:02–08: "Q: And what facts do you have to support an allegation that your age had anything to do with that? .... A: I don't have any facts. That was my belief."

3. Jamal claims Magee's delay of her performance evaluation and the "acceptable" rating resulted in less of a pay increase than she would have received had she been fairly and timely evaluated, although Jamal testified in deposition that her reviews were late both before and after she complained.

al's new supervisor, gave Jamal a "commendable" performance evaluation for the year November 1998 through November 1999. Hart praised Jamal but, as Magee had, noted problems with Jamal's management performance. Hart and Magee approved another raise for Jamal of almost $5,000.

In early 2000, Jamal approached Wilshire's President and CEO Jay Memmott about an opening for a vice president-level position. She decided not to apply when she learned the position involved working with Magee. When Memmott asked Jamal why working with Magee might be a problem, Jamal declined to explain.

In June 2000, Jamal met with Memmott and told him she and other anonymous employees thought Magee was a bad manager. Jamal admitted in her deposition she did not mention age discrimination to Memmott at that time or in the investigation that followed. *See, e.g.,* Jamal Depo., 28:06–29:22. Further, Wilshire says Jamal kept two detailed sets of notes regarding her complaints to Memmott and nowhere in either set of notes does she mention age discrimination, even though she testified at deposition she tried to make those notes inclusive of all issues she discussed with him.

In any event, at the time of that meeting with Memmott, Jamal says, in the material she filed with the court, she made the following complaints about Magee:

(1) Magee's 1998 removal of Jamal from her LWO manager position and her failure to restore the position when Wilshire's financial situation improved.

(2) Magee's threats to fire Jamal and others, such as Jan Haskin.

(3) Magee's favoritism toward other employees, including allowing them to telecommute but not allowing Jamal to do the same.

(4) Magee's lack of respect during meetings and failure to meet with Jamal, or making her wait for long periods of time outside her office while she chatted on the phone or in person with friends.

(5) Magee's comment that Phil Vincent (Wilshire's vice president) would always protect her job and Magee's bragging about being Vincent's lover.

(6) Magee going into Haskin's drawer and holding up pain pills in front of everyone and saying "if you were better organized, you wouldn't need these."

(7) The insubordination of Ben Estep and Magee's failure to do anything when Jamal complained to her.

(8) Magee's offensive and humiliating conduct at work-related functions, such as in 1999 requiring a male employee to take a "body shot" off of Jamal's chest, and grabbing Jamal's shirt open in public in front of male employees.

(9) Magee's racially offensive comment during a meeting with Jamal and Anne Halverson (an African–American co-worker) regarding "half-breed children" when both Jamal and Halverson were in mixed-race marriages.

Jamal's Concise Statement of Material Facts (CSMF), pp. 8–9.

Wilshire's Human Resources Department (HR) immediately began an investigation into Jamal's and the other employees' concerns. Over the next two months, HR interviewed more than a dozen employees, including nearly every person in Magee's department. HR interviewed Jamal, and Jamal confirmed at deposition she talked primarily of her concerns that her management duties had been reduced and her position as the LWO manager had been lost. Jamal also told HR that Magee had poor administrative skills with direct reports, showed favoritism toward those who did not challenge her views, was a negative person, and overall had a bad management style. Several persons (men, women, African Americans, Caucasians,

and people both over and under 40) interviewed by HR voiced similar concerns about Magee's management style. Wilshire placed Magee on a detailed performance improvement plan. It hired an outside consultant, Ken Hill, to help Magee make constructive changes to her management style.[4]

Jamal alleges that after she complained to Memmott about Magee in June 2000, Magee began to retaliate against her and continued to discriminate against her.

In late June 2000, Magee promoted Caren Brown, who was younger than Jamal, to the position of bankruptcy manager. Jamal asserts the position was not posted internally and that she was more qualified for the promotion than Brown.

Jamal also specifically lists in the material filed with the court the following complaints that began after her June 2000 complaint to Memmott:

(a) In September or October 2000, in order to get her in trouble in retaliation for her complaints, Magee caused another employee to make a complaint to HR about Jamal checking her department's accounts. When it was discovered Magee had requested Jamal to check, Magee did nothing to support Jamal.

(b) In an October 2000 staff meeting, Magee "loudly and rudely" contradicted Jamal regarding her interpretation of a particular state's foreclosure laws. Even after it became clear that Jamal was right, Magee refused to apologize to her. Jamal felt "humiliated and degraded" because her competence was attacked without justification.

(c) In October 2000, Jamal was called into HR and presented with a host of criticisms of her job performance that originated with Magee. Jamal asserts that after she rebutted each false accusation and informed HR she was "contemplating seeking legal representation because of the harassment and retaliation she was being subjected to," Susan Christian of Wilshire's HR department stated that maybe Jamal should just quit her job or transfer to another building.[5]

(d) In December 2000, Magee asked Memmott for a $500 reduction in Jamal's bonus, claiming in writing that Jamal was less valuable and more replaceable than her younger peer Estep (a personal friend of Magee's) and that Estep be given the $500 difference as part of his bonus.

Jamal's CSMF, pp. 10–11.

Jamal asserts that in October 2000, she told Memmott that she was "disappointed because there was no resolution to my issues, that it would have to be worked out sometime in the future, that I still had no answers about why I was experiencing what I was going through, and that I didn't know that that was an acceptable resolution." Jamal Depo. 217:04–11. She testified at deposition that she thought "giving [Magee] the opportunity to change her behavior ... without any resolution to me of my issues, was not fair." Jamal Depo. 217:04–11 and 219:09–11. She testified she wanted "[m]y title, why I was managing people without a supervisory title, an explanation about why I was taken out of my position, why my Deficiency Department was taken away, why [Magee] didn't have the courtesy to even say hello to me or make eye contact with me or give me five minutes of her time." Jamal Depo. 219:12–21. Jamal testified that she

---

**4.** Magee ultimately failed to adequately improve her management and communication skills. Wilshire requested her resignation effective October 4, 2001.

**5.** Christian's notes from the meeting indicate she asked Jamal if she would like to transfer to another building.

wanted Magee fired. Jamal Depo. 217:04–11.

Also in October 2000, Jamal attended a joint meeting with Magee, Hill, and Christian. Magee reviewed what she wanted to do, and what she believed to be some of her management issues.

On December 12, 2000, Magee promoted Brown again to manager of both the foreclosure and bankruptcy departments. Jamal asserts the position was not posted internally, and that she was more qualified for the promotion than Brown.

Later in December 2000, Magee promoted Hart, Jamal's immediate supervisor, to assistant vice president of information services and supplies. Jamal asserts the position was not posted internally, and that Hart was substantially younger than she was. After promoting Hart, Magee did not promote Jamal to Hart's vacated position, for which she was qualified, but instead promoted Estep to that position.

In late December 2000, Magee promoted Heidi Peterson to assistant vice president of collateral. Jamal asserts the position was not posted internally. Jamal says she was more qualified for the position than Peterson.

In January 2001, Wilshire posted the position of Heilig–Meyers collection manager. Jamal applied for the position and was interviewed. Wilshire did not hire Jamal for the position but rather hired Bonnie Baker from the outside. Wilshire asserts it hired Baker because she had extensive experience with the particular type of loan involved in the position. It is not disputed that Magee was not involved in the hiring decision. Jamal asserts Baker was substantially younger, and again she was more qualified, or at least as qualified, for the position as Baker.

Jamal claims that on February 14, 2001, she placed a written complaint mentioning harassment, violation of civil rights, and age discrimination in the in-box on Memmott's assistant's desk. Memmott asserts he never received the written complaint, and it is undisputed that Jamal never received a response from Memmott. Wilshire points out that Jamal does not mention this alleged complaint in her subsequent June 2001 complaint to Wilshire. She also did not mention or provide a copy of the document to the Bureau of Labor & Industries (BOLI), although she testified at deposition she was diligent in providing to BOLI all documents and information that might support her claims.

Jamal contends that after her February 2001 complaint to Memmott, Magee continued to retaliate against her and discriminate against her. Jamal lists the following specific incidents occurring after February 2001:

(a) In March 2001, Magee e-mailed Memmott to accuse Jamal of putting notes on the comment screen of the computer system, and asked Memmott to restrict Jamal's computer access, which would have interfered with her ability to perform her work.

(b) In April 2001, Jamal was given the senior lienholders' group to supervise without benefit of a management title or an increase in pay. Magee informed Jamal she would have to "prove" herself before she could have a management title and pay increase. Jamal asserts Hart, Brown, Estep, or Baker, all younger than Jamal, were never required to prove themselves before they received management titles and pay increases.

(c) In April 2001, Magee e-mailed both Hart and Jamal asking why a loan was coded with a certain number. Jamal felt "attacked" by this incident.

(d) In May and June of 2001, Magee deleted at least a dozen e-mails from Jamal without reading them. Jamal

says each of the e-mails contained detailed documentation of her performance and accomplishments in her capacity as supervisor of the senior lienholders' group. Jamal complains Magee deliberately destroyed or refused to accept the "proof" she had required of Jamal.

Jamal's CSMF, pp. 12–13.

On June 24, 2001, Jamal went on medical leave, claiming excessive stress at work. She resigned her position on September 14, 2001, effective September 19, 2001, without having ever returned to work.

It is undisputed that on June 24, 2001, the day she left on medical leave, Jamal presented Memmott and HR with a written complaint alleging age discrimination and retaliation by Magee. Wilshire says this is the first time it had any complaints of age discrimination from Jamal. Of course, Jamal asserts she had included these complaints in her February 2001 letter that Wilshire says it never received.

After Jamal's June 2001 complaint, Wilshire hired an independent human resources firm, Human Resources Specialities, Inc. (HRS) to investigate Jamal's complaint. HRS's investigator, Patricia Haggin, interviewed 12 employees, including Jamal. Haggin concluded there was no evidence of illegal discrimination in the decision to remove Jamal from the LWO manager's position and no evidence she was denied promotions because of her age or as retaliation for raising issues.[6] Haggin reported that almost all of the employees she interviewed stated they did not believe that Magee harassed Jamal because of her age. Even those employees who thought Magee was harsher on Jamal than others did not think it was because of her age, but rather because Jamal often

challenged Magee's management and direction when she disagreed.

On October 11, 2001, Jamal filed her first BOLI complaint alleging only age discrimination and retaliation under the ADEA and state statutory law.

In January 2002, Wilshire hired an outside person, Bev Conklin, for the position of manager of loan workout (Jamal's former position). Jamal contends Wilshire's failure to contact her about her interest in the position was retaliation based on her complaints about age discrimination and retaliation, including her filing of a BOLI complaint.

In March 2002, Jamal was deposed by Wilshire in a race discrimination suit filed against Wilshire by Halverson, Jamal's African–American former co-worker.

In December 2002, prior to filing this lawsuit, Jamal learned that Wilshire was seeking to fill two management positions. She applied for the positions, but was not interviewed for either. Jamal claims Wilshire's failure to interview or hire her for either position was retaliation based on her complaints about age and race discrimination.

On April 1, 2003, almost 19 months after her resignation from Wilshire, Jamal filed a second BOLI complaint again alleging age discrimination and retaliation and, for the first time, retaliation for complaints of race discrimination.

On January 3, 2003, Jamal filed her complaint with this court.

### Summary Judgment Standards

Fed.R.Civ.P. 56 authorizes summary judgment if no genuine issue exists regarding any material fact and the moving

---

**6.** Jamal testified in her deposition that she has no criticisms of Haggin's report Jamal

Depo., 347:02–16, 403:08–404–10.

party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e).

An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Guidroz–Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Hensley v. Northwest Permanente P.C. Ret. Plan & Trust*, 258 F.3d 986, 999 (9th Cir.2001), *cert. denied*, 534 U.S. 1082, 122 S.Ct. 815, 151 L.Ed.2d 699 (2002). A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir.1990). When the nonmoving party's claims are factually implausible, that party must come forward with more persuasive evidence than otherwise would be required. *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir.1998) (citation omitted).

Under Fed.R.Civ.P. 56, "[s]upporting and opposing affidavits [to a summary judgment motion] shall be made on personal knowledge, shall set forth such facts as would be admissible into evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, evidence a party relies on with respect to a summary judgment must have an appropriate foundation and must be admissible.

The substantive law governing a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Arpin*, 261 F.3d at 919.

At the summary judgment stage, the "requisite degree of proof necessary to establish a *prima facie* case ... is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994).

### Statutes of Limitation

#### A. Federal Statutes of Limitation.

Jamal filed her first BOLI complaint alleging only age discrimination and age-based retaliation on October 11, 2001. The applicable federal statute of limitations is 300 days. Therefore, any discrete discriminatory acts Jamal relies upon in her federal age discrimination and age-based retaliation claims that occurred before December 14, 2000, are time-barred.

Jamal filed her second BOLI charge on April 1, 2003, asserting age discrimination, age-based retaliation, and race-based retaliation. Therefore, any discrete discriminatory acts Jamal relies upon in her federal race-based retaliation claim that occurred before June 5, 2002, are time-barred.

#### B. State Statutes of Limitation.

The parallel state law claims have a one-year limitations period. Therefore, actions prior to October 12, 2000, are barred as to her state age discrimination and age-based retaliation claims, and actions prior to April 2, 2002, are barred as to her state race-based retaliation claim.

### Age Discrimination

#### A. Prima Facie Case.

The ADEA makes it unlawful for an employer to hire or discharge any individ-

ual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's age. Protection extends to all individuals who are at least 40 years old. 29 U.S.C. § 631(a). Oregon law also prohibits age discrimination, but extends protection to individuals over the age of 18. Or.Rev. Stat. § 659.030(1)(a) & (b). A plaintiff must show that her age "actually played a role in [the decision-making] process and had a determinative influence on the outcome." *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 745 (9th Cir.2003).

■ The Ninth Circuit analyzes ADEA cases using the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Generally, to establish a *prima facie* case of an ADEA violation, the plaintiff must show she (1) belonged to a protected class; (2) was satisfactorily performing her job or was qualified for hire or promotion; (3) was terminated, rejected for employment, or otherwise subjected to an adverse employment action; and (4) was replaced by a substantially younger employee with equal or inferior qualifications. *Wallis v. J.R. Simplot Company*, 26 F.3d 885, 891 (9th Cir.1994); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Chuang v. University of Calif. Davis*, 225 F.3d 1115, 1123 (9th Cir.2000). Oregon's standard for establishing a *prima facie* case of discrimination is identical to that under federal law. *Henderson v. Jantzen, Inc.*, 79 Or.App. 654, 657, 719 P.2d 1322, *rev. denied*, 302 Or. 35, 726 P.2d 934 (1986).

Proof of the replacement element is not always required. Where the discharge results from a reduction in work force, the plaintiff may show through circumstantial, statistical or direct evidence that the discharged occurred under circumstances giving rise to an inference of age discrimina-

tion. *Wallis* at 891; *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir.1990). *See also Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir.1993) (*prima facie* case established by proving others not in employee's protected class were treated more favorably).

The requisite degree of proof necessary to establish a *prima facie* case on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence. *Wallis v. J.R. Simplot Co.*, 26 F.3d at 889.

### A. *First Two Elements of Prima Facie Case.*

The parties do not dispute that the first two elements of Jamal's *prima facie* case are satisfied: (1) Jamal belonged to a protected class; and (2) she was satisfactorily performing her job or was qualified for hire or promotion.

### B. *Adverse Employment Actions.*

The Ninth Circuit has made clear only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute adverse employment actions. *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir.2000).

This court has reviewed Jamal's complaints to determine which are non-trivial employment actions that are legally actionable as adverse employment actions:

#### 1. *1998 Elimination of LWO Manager Position.*

Although theoretically actionable as an adverse employment action, this claim is time-barred for both federal and state law purposes.

### 2. *Failures to Promote or Hire.*

This court concludes that failures to promote or hire can be non-trivial employment actions. However, two of the failures to promote or hire complained of by Jamal are time-barred. Three are not time-barred and can therefore constitute actionable adverse actions:

#### (a) *Time–Barred    Adverse    Action Claims.*

The following alleged failures to promote occurred before December 14, 2000, the limitations period for Jamal's federal age discrimination and age-based retaliation claims: [7]

(1) The June 29, 2000, promotion of Brown to the position of bankruptcy manager.

(2) The December 12, 2000, promotion of Brown to manager of the foreclosure and bankruptcy departments.

#### (b) *Timely Adverse Action Claims.*

The following alleged failures to promote or hire occurred after December 14, 2000, and are therefore not time-barred:

(1) The December 2000 promotion of Hart to assistant vice president information services and supplies, and the promotion of Estep to fill Hart's vacated position.

(2) The December 2000 promotion of Peterson to assistant vice president of collateral.

(3) The January 2001 hiring of Baker for the of Heilig–Meyers collection manager position.

### 3. *State Law Adverse Action Claims.*

For purposes of state law, the time-barred and timely claims of failure to promote or hire are the same as those under federal law, except that the December 12, 2000, promotion of Brown to manager of the foreclosure and bankruptcy departments is not time-barred for state law purposes.

### 4. *Post–Employment Actions.*

■ This court concludes that some post-employment actions can be non-trivial employment actions. Jamal contends that two post-employment actions constituted adverse employment actions in retaliation for her age-based complaints about discrimination:

(a) Wilshire's failure to contact Jamal, in January 2002 about her interest in the reinstated LWO manager position.

(b) Wilshire's failure to interview or hire Jamal in December 2002 for two management positions for which she applied.

This court concludes that subparagraph (a) above is not an actionable adverse employment action, but subparagraph (b) is. As to subparagraph (a), Jamal cites no authority for the proposition that Wilshire's January 2002 failure to contact her about her interest in LWO manager position is actionable as an adverse employment action, nor any authority for the proposition that Wilshire had any obligation to inquire of its former employee, Jamal, about her interest in the position. The Ninth Circuit has held that refusing to hold a job open for an employee is not an adverse employment action. *McAlindin v.*

---

**7.** As discussed below, because Jamal did not complain of race-based retaliation until her second BOLI complaint on April 1, 2003, failures to promote before that date are not time-barred, but they cannot logically be ac-   tionable retaliation claims because they occurred in December 2000 and January 2001, which was before she filed her BOLI complaint in April 2003.

*County of San Diego,* 192 F.3d 1226, 1238–39 (9th Cir.1999). This court has no basis on which to extend the meaning of adverse employment action to include a situation where an employer's reinstatement of a position it had eliminated approximately four years earlier, and its failure to contact its former employer about her interest in the position, can legally constitute an adverse employment action.

As to subparagraph (b), Wilshire's failure to interview or hire Jamal in December 2002, it appears this claim is actionable as an alleged retaliatory post-employment action. In *Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), the Supreme Court held that former employees may state a cognizable Title VII claim for post-employment retaliation. In *Robinson,* plaintiff's former employer had given plaintiff a negative reference when he applied for a job at another company, and he alleged the negative reference was in retaliation for his filing of discrimination charges against defendant. The Court held post-employment conduct can be actionable in the proper circumstances. *See also Landon v. Northwest Airlines,* 72 F.3d 620, 626 (8th Cir.1995) (suggesting that post-employment retaliatory acts may be actionable when certain conditions are met).

This court has found no post-employment action cases dealing with the specific situation in this case. Many cases addressing the post-employment issue have afforded protection to plaintiffs in connection with a former employer's negative performance evaluations to a prospective employer. *See, e.g., Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 157 (3rd Cir.1999) (post-employment actions by an employer can constitute discrimination under Title VII if they hurt a plaintiff's employment prospects); *Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527 (11th Cir.1990) (alleging former employer persuaded current employer to discharge employee for employee's participation in charge against former employer); *Rutherford v. American Bank of Commerce,* 565 F.2d 1162 (10th Cir.1977) (advising prospective employer that plaintiff had filed sex discrimination charges). Other cases have applied the rule to post-employment harassment by the employer (*see, e.g., Reed v. Shepard,* 939 F.2d 484 (7th Cir.1991) (retaliatory measures included assault, phone threats, and shooting at plaintiff's vehicle)), and suspension or termination of benefits over which the former employer has direct control (*see, e.g., EEOC v. Cosmair, Inc.,* 821 F.2d 1085 (5th Cir.1987) (employer discontinued severance pay after former employee filed charges)). Even so, for purposes of this summary judgment this court will consider the situation in this case to be an actionable post-employment adverse employment action. This court notes that the Ninth Circuit held in *O'Brien v. Sky Chefs, Inc.,* 670 F.2d 864 (1982), *rev'd on other grounds,* 810 F.2d 1477, 1481–82 (9th Cir.1987), (*en banc*) that, for purposes of summary judgment, plaintiffs' allegations that defendant "refused to rehire and gave bad recommendations after termination and the filing of EEOC charges, are sufficient to assert retaliation claims." However, the *O'Brien* case does not provide guidance for Jamal's failure to hire claim because the court's single conclusory statement was not supported by underlying facts, discussion, or citations of authority. There are no allegations in this case that Wilshire gave bad recommendations of Jamal to other employers. The court also notes Jamal's alleged post-employment action is not a "rehire" (returning a plaintiff to her former position), but rather a "hire" for two different managerial positions.

Thus, assuming Wilshire's post-employment failure to hire Jamal constitutes an

actionable claim in the situation before this court, Wilshire's December 2002 failure to hire Jamal constitutes an adverse employment action.

## C. *Inference of Discrimination.*

The next element of the *prima face* that Jamal must establish is that the adverse employment actions took place under circumstances giving rise to an inference of age discrimination. *Wallis* at 891.

Wilshire argues Jamal has cited to nothing that could support an inference of age discrimination. It says Jamal has no evidence that age was ever a factor in any of Magee's conduct or the situations about which she complains. There were no inappropriate age-related comments, and Magee routinely promoted Jamal and raised her salary when Jamal was 46 to 48 years old. Further, Wilshire asserts it is undisputed that several employees in their 20s and 30s complained of the same types of abrasive or harsh behaviors and favoritism from Magee as Jamal did.

Jamal offers circumstantial evidence, in three categories, that she says is sufficient to establish a triable issue of fact on inference of discrimination:

### 1. *Comparator Employees.*

Jamal argues that all the comparator employees she identifies were treated more favorably than she was on the basis of age. Three of the five comparators were aged 40 to 43 during the relevant time period, and the ADEA extends protection to individuals who are at least 40 years old. Even so, Jamal argues that in an age discrimination claim, because the relevant inquiry is whether the employee has suffered adverse action because of her age, the requirement that a comparator employee be outside the protected class has been eliminated, citing *O'Connor v. Consolidated Coin Caterers, Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Jamal argues the ADEA does not require comparator employees to be under the age of 40 in order for there to be an inference of discrimination created. "The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.*" *O'Connor,* 517 U.S. at 312–13, 116 S.Ct. 1307 (emphasis in original). Thus, Jamal argues the age discrimination plaintiff meets the requirement of an inference of discrimination by doing no more than demonstrating that she was treated less favorably than a younger employee or employees, whether or not those employees are under the age of 40.

Jamal identifies the following five employees as her comparator employees: Estep, Brown, Hart, Peterson, and Baker. Because this court has concluded one Brown promotion is not actionable because barred by the federal statute of limitations, Brown cannot be a comparator for federal law purposes, but can be a comparator for Jamal's state law claim regarding Brown's December 12, 2000, promotion. Although there are some inconsistencies in the record, the following appear to be the ages of Jamal, Magee, and her comparator employees in 2000:

| | |
|---|---|
| Jamal | 50 |
| Magee | 37 |
| Hart | 43 |
| Estep | Late 30s |
| Peterson | 40 |
| Baker | 40 |
| Brown | 29 |

This court agrees that Jamal can use Estep, Brown, Hart, Peterson, and Baker as her comparator employees.

### 2. *Age Discrimination Against Other Older Employees.*

Jamal says she has presented evidence of age discrimination against other employees that creates an inference of dis-

crimination. She argues it is well established law in this circuit that evidence that other persons in a plaintiff's protected class were likewise subjected to unlawful discrimination is both relevant and admissible to show plaintiff was subjected to unlawful discrimination, citing *Heyne v. Caruso,* 69 F.3d 1475 (9th Cir.1995).

Jamal's evidence in this regard includes:

(1) Statements of Pat Stoneking [8], 54, that she was terminated after Wilshire falsely accused her of making a decision that had cost Wilshire potential income, while substantially younger employees who had made more significant errors were not terminated.

(2) Statements of Janice White, 52, that she resigned from Wilshire in January 2004 due to unfair treatment she received, including Wilshire's repeated failure to promote her and pay cuts. She says substantially younger employees, even ones who had been found incompetent, were not given pay cuts after demotion and/or transfer.

(3) Jamal's complaint that Hart received a pay raise each time she was promoted by Magee. Jamal asserts that by comparison, although promoted twice, Haskin never received a pay raise.

(4) Jamal's complaint that when, in October 2000, Memmott informed her that an investigation had been conducted into her June 2000, grievance, he omitted some of what the investigator had learned from Haskin, the only management witness close to the age of 50 who was interviewed. Jamal says Haskin told the investigator that Magee singled out Jamal for negative treatment and that she thinks Jamal was retaliated against because she did not have a team lead job title, and because she was not considered for the position that Brown got. Jamal says Haskin also said she

thinks Magee does not like older people and that she picked on Jamal and Haskin, but does not pick on Brown and Hart because they are her favorites.

Wilshire disputes Jamal's assertions about pay raises for Hart and Haskin.

Wilshire also counters that Jamal improperly points to one witness, Haskin, who Jamal claims thought Magee did not like older people, in an attempt to discredit the entire results of Wilshire's investigation of her complaints. Further, Wilshire points out that in her deposition, Haskin in fact clarified that the statement attributed to her in the investigation report about Magee treating older workers adversely was actually her recitation of Jamal's belief. Haskin Depo. 69:22–70:24. Haskin stated in deposition that after seeing years of interaction between Jamal and Magee, she was unaware of any age discrimination by Magee or Wilshire, and that she had never had the feeling in her career at Wilshire that there was any age discrimination going on.

### 3. *Age Discrimination Against Jamal.*

The following are Jamal's complaints about her ill treatment that she argues creates an inference of illegal age discrimination:

(a) Others interviewed by HR confirmed unfair and different treatment of Jamal by Magee:

(i) Rachael Gordon: Magee's treatment depends on who the employee is. She treated Jamal, Haskin, and Halverson differently than she did Brown and Hart.

(ii) Cynthia Oliver: Brown got a manager job with no foreclosure experience. She thinks the fact Jamal is not a man-

---

**8.** Wilshire has moved to strike the Stoneking and White declarations. As discussed in a separate section below, this court denies the motion.

ager now is evidence she has been retaliated against.

(b) Magee did not mentor Jamal, did not provide her with appropriate feedback, did not appropriately counsel her, and did not provide her with the same career path assistance as she did younger employees, all of whom Magee promoted in 2000–2001 to management positions when Jamal was seeking to be restored to management.

(c) In December 2000, Magee asked Memmott for a reduction of Jamal's bonus so Estep could have a larger bonus.

(d) In March 2001, Magee e-mailed Memmott to accuse Jamal of putting notes on the comment screen on the computer system and asked Memmott to restrict Jamal's computer access.

(e) Magee and Hart's April 2001 request that Jamal to assume more management responsibilities while "unfairly" subjecting her to the "unprecedented" requirement that plaintiff" prove herself" before she received a raise in conjunction with those responsibilities.[9]

(f) Magee's April 2001 e-mail to Hart and Jamal questioning the coding of a loan.

### 4. Discussion.

This court concludes Jamal's showing of the *prima facie* element of inference of discrimination is weak. She has many complaints about how she was treated by Magee, but has not offered evidence that the mistreatment was because of her age. As the record shows, the majority of Jamal's complaints range from the trivial to the routine. The record shows there was substantial on-going workplace friction between Jamal and Magee. It is undisputed that Magee was a poor manager and tended to favor certain employees who did not

challenge her decisions. However, Jamal has not shown that Magee's conduct, or her favoritism of certain other employees, were related to Jamal's age or motivated by age discrimination. "[N]ot all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

The *prima facie* case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion. *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. at 312, 116 S.Ct. 1307. In the age discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker who is not substantially younger. *Id.* Along this line, Jamal offers scant evidence to create an inference that Wilshire's treatment of her comparator employees had anything to do with age. Further, although Jamal's comparator employees were younger than she, that fact alone does not create an inference of discrimination. The comparators must be "substantially" younger to create an inference of discrimination. *Id.* In this case, three of her four comparator employees for federal law purposes ranged from 40 to 43 years old, and one was in his late 30s.

Further, the record also indicates that Jamal was 46 years old when she began working for Magee, and that Magee was involved in promoting Jamal and giving her raises during the period when Jamal was 46 to 48 years old. Jamal received $12,000 in pay raises during his first year of working with Magee. These facts are inconsistent with a inference of discrimination. Jamal provides the court with no

---

**9.** This court notes the record establishes that in 1998 another employee who reported to Jamal was told when he accepted a pro- motion that he would be compensated for the promotion after a period to prove himself.

evidence of why Magee would promote her and raise her salary until she was 48, and then begin discriminating against her because of her age.

Jamal does argue that complaints of Stoneking and White about Wilshire constitute evidence sufficient to raise an inference of discrimination. The court agrees that the perceptions and speculations of other employees, as limited by the rules of evidence, can be some evidence of discrimination. Even so, it is a very close question whether Jamal has presented sufficient evidence to establish the inference of discrimination element of her *prima facie* case. Even taking into account the complaints of Stoneking and White, Jamal has produced very little to imply, much less show, that the matters of which she complains were caused by or related to her age. That being said, in the context of summary judgment and viewing all facts in a light favorable to Jamal, this court must conclude Jamal has satisfied the *prima facie* element of inference of discrimination.

## D. *Nondiscriminatory Reasons/Pretext.*

■ Once a *prima facie* case is made out by the plaintiff, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Chuang v. University of California Davis,* 225 F.3d at 1123. If the employer does so, the plaintiff is then afforded an opportunity to demonstrate that the employer's proffered reason was pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing

that the employer's proffered explanation is unworthy of credence." *Texas. Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Chuang* at 1124. A plaintiff must show that the employer's proffered reason is not credible, and show that an unlawful discriminatory intent motivated the employer's actions. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 516, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). A plaintiff's evidence "must be both *specific and substantial* to overcome the legitimate reasons put forth by [the employer]." *Aragon v. Republic Silver State Disposal. Inc.,* 292 F.3d 654, 659 (9th Cir.2002) (emphasis in original).

Although Oregon courts analyzing claims under Or.Rev.Stat. Chapter 659 have rejected the *McDonnell Douglas* burden-shifting approach, that approach nonetheless applies to the assessment of Oregon employment discrimination claims brought in federal court. *Snead v. Metropolitan Prop. & Cas. Ins. Co.,* 237 F.3d 1080 (9th Cir.), *cert denied,* 534 U.S. 888, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001).

Wilshire asserts it promoted Hart, Estep, Brown, and Peterson because the new jobs were within their general job categories and they were the most qualified for the managerial positions.[10] Wilshire asserts it hired Baker for the Heilig–Meyers collection manager position in January 2001 because she had extensive experience with this particular type of loan. Jamal presents no evidence that she was experienced with that particular type of loan. Memmott and Ken Frye, not Magee, made the hiring decision for the manager of the new portfolio.[11]

---

10. The record indicates that although Jamal received praise for aspects of her job performance, there were concerns expressed about her abilities as a manager.

11. Wilshire argues that failures to promote not involving Magee, the only person Jamal

specifically names as discriminating against her, are not actionable. Employers are legally responsible for the discriminatory acts of their supervisory employees. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 75, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (Marshall, J., concurring). Wilshire is responsible for the dis-

Wilshire argues Jamal has not shown her qualifications were so vastly superior to those of Hart, Estep, Peterson, Brown, or Baker as to "jump off the page and slap you in the face," citing *Deines v. Texas Dept. of Prot. & Reg. Services,* 164 F.3d 277, 279 (5th Cir.1999) (Disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as to virtually "jump off the page and slap you in the face."). "[A]n employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact." *Bradley v. Harcourt, Brace and Co.,* 104 F.3d 267, 270 (9th Cir.1996). Mere comparisons of qualifications are insufficient to show pretext on summary judgment. *Odima v. Westin Tucson Hotel Co.,* 991 F.2d 595, 602 (9th Cir.1993). "The district court must not substitute its own judgment about whether the employment decisions were wise, or even fair, for that of the employer .... [T]he district court's conclusions must be based on factual findings grounded in the record, and not on vague, impressionistic notions that defendant must have discriminated against [plaintiff] because [s]he is deserving of a better job." *Id.* This court agrees with Wilshire that Jamal has presented no evidence, other than her speculation and her assessment of her own qualifications, that Wilshire's decision to promote others and hire Baker had anything to do with Jamal's age.

As to Wilshire's failures to hire Jamal after she left Wilshire, Jamal has presented no evidence, other than her speculation, that the decision had anything to do with her age or her complaints. Again, the record establishes that Jamal's managers, both Magee and Hart,[12] had expressed concerns about Jamal's performance as a manager. Both of the positions at issue here were management positions. Further, Christian testified one of the positions had been filled by the time plaintiff expressed an interest. As to the other position, Christian testified that "Keith Douglas [was] the Hiring manager for that position, and we gave him all of the resumes that [met the minimal qualifications]. We didn't want him to have any bias at all." Christian Depo. 94:24–95:11. Jamal has presented only her speculations to support her contention that she was not hired for these positions because of her age or her complaints against Wilshire. There is no evidence Douglas knew of Jamal's complaints, and Jamal has not alleged that Douglas retaliated against her.

Further, Wilshire has shown the independent human resources firm it hired to investigate Jamal's June 2001 complaint of illegal discrimination found no evidence of illegal discrimination. There are no contentions by Jamal that the investigator was biased or did anything inappropriate in its investigation. Many other employees (including those under and over 40, male and female) interviewed in the investigation identified concerns about Magee's management style. For example:

(1) Joyce Kingsvogel (age 29). Kingsvogel said Magee is rude and abrasive. She is very difficult. Unless you are on her good side, she will never give you the opportunity to advance.

(2) Rachel Gordon (age 30). Gordon said that during a meeting, Magee made accusing statements to her that were embarrassing and demeaning. She was reduced to tears by the statements. Further, she said Magee never or only

criminatory acts of Magee and any others in the company who may have discriminated against Jamal, even if not specifically named by Jamal.

**12.** Jamal does not allege Hart discriminated against her.

sometimes demonstrated fair and equal treatment, and described her communications with Magee as "poor."

(3) Maden Parsely (age 35). Parsely said Magee does not give positive feedback or acknowledge her staff. Magee is not approachable and belittles people. When she inquired of Magee about a promotion, Magee said she would not be happy and never pursued it. Magee showed favoritism toward some employees.

Jamal also offers no facts to contradict that Magee participated in promoting Jamal, recommending raises, and providing praise and favorable reviews when Jamal was 46–48 years old. Jamal does not explain why Magee would promote and give raises to her when she was 46 to 48 years old, and then suddenly discriminate against her because of her age thereafter. Favorable treatment of a person in a protected class by the alleged discriminator creates a "strong inference" that there was no discrimination. "An individual who is willing to hire and promote a person of a certain class [or protected status] is unlikely to fire them simply because they are a member of that class." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir.1995), *cert. denied*, 516 U.S. 1078, 116 S.Ct. 785, 133 L.Ed.2d 736 (1996). This results in a strong inference that there was no discriminatory motive. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1286 (9th Cir.2000).

The court concludes Wilshire has presented evidence that its motives and actions with respect to each of the adverse employment actions of which plaintiff complains were nondiscriminatory and legitimate. It is clear Magee was a problem as a manager for both Wilshire and Jamal. Jamal and others complained about Magee being a bad manager and very difficult to get along with, and Wilshire immediately started an investigation and set up a process to assist Magee in improving her skills.

In deciding whether an issue of fact has been created about the credibility of the employer's nondiscriminatory reasons and issues of pretext, the district court must look at the evidence supporting the *prima facie* case, as well as the other evidence offered by the plaintiff to rebut the employer's offered reasons. *Wallis v. J.R. Simplot Company*, 26 F.3d at 890. "[I]n those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination under *McDonnell Douglas*, plaintiff has failed to raise a triable issue of fact." *Id.* As discussed earlier in this opinion, this court has already determined that Jamal has proffered only the minimum of evidence to show the inference of discrimination element of her *prima facie* case. Jamal has only minimally added to that evidence with her arguments about pretext. This court concludes there is insufficient evidence to raise an issue of fact about Wilshire's articulated reasons.

### E. *Conclusion.*

Assuming Jamal has established a *prima facie* case of age discrimination, she has not presented evidence sufficient to meet her burden with respect to the alleged pretext of Wilshire's nondiscriminatory, legitimate reasons for the adverse employment actions. Therefore, Wilshire's motion for summary judgment on Jamal's age discrimination claim is granted.

As to Jamal's allegations about the December 12, 2000 promotion of Brown to manager of the foreclosure and bankruptcy departments, a claim barred by the federal statute of limitations but not the state, this court concludes its evaluation of Jamal's *prima face* case and pretext arguments and its conclusions apply equally

here. Wilshire's motion for summary judgment on these allegations is also granted.

### Retaliation—Age Discrimination

#### A. *Prima Facie Case.*

The ADEA, Title VII and Oregon law prohibit retaliation against an employee because the employee has taken action to oppose discriminatory employment practices. 29 U.S.C. § 623(d); 42 U.S.C. § 2000e–3(a); Or.Rev.Stat. § 659.030(1)(f). The same burden-shifting methodology discussed above is employed for claims involving retaliation. *See, e.g., Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir. 2000).

■ A plaintiff may establish a *prima facie* case of discriminatory retaliation by showing that: (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. *Bergene v. Salt River Project Agric. Improvement & Power Dist.,* 272 F.3d 1136, 1141 (9th Cir.2001); *Morgan v. National RR Passenger Corp.,* 232 F.3d 1008, 1017 (9th Cir.2000). "[O]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks v. City of San Mateo,* 229 F.3d at 928 (citation omitted).

Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action. *Id.* Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was pretext. *Id.*

#### B. *Protected Activities.*

■ Jamal argues there is ample evidence in the record to support a reasonable inference that she engaged in protected activities at least three times prior to June 24, 2001. She characterizes the following as protected activities:

1. She says she complained to Memmott and HR in June 2000 about Magee's harassing treatment of herself and others (including older employee Haskin and African–American employee Halverson). Because it is not disputed that Wilshire immediately launched an investigation involving its in-house counsel and that Memmott and HR thereafter told Magee not to retaliate, Jamal argues a reasonable trier of fact could infer from Wilshire's response that it considered the complaint to be about some form of unlawful discrimination. Jamal says it does not matter that she did not use magic words like "age" or "race" or "discrimination" when she made her complaints. It was enough that she described treatment or conduct that could reasonably be construed to involve federal or state discrimination laws.

2. She says she complained she was being retaliated against and continued to be harassed by Magee in October 2000. She says HR's response to this complaint was to suggest she either quit her job or transfer to another building.

3. She says on February 14, 2001, she again complained to Memmott, this time in a written memorandum. She says expressly used the words age and discrimination in the subject line of the memorandum. Of course, Wilshire asserts no one in management ever saw the memorandum.

Although did Jamal complain to Memmott in June 2000, this court concludes her complaint did not mention age discrimination, which conclusion is supported both by the facts and Jamal's current arguments about "inferring" she complained about age discrimination. In fact, Jamal admit-

ted in her deposition she did not mention age discrimination to Memmott at that time or in the investigation that followed. As a matter of law, her June 2000 complaint was not a protected activity. There can be no inference that she meant illegal age discrimination when all she ever complained of was that she and anonymous other employees thought Magee was a bad manager. Her October 2000 conversation with HR also was not a protected activity. There is no evidence in the record that illegal discrimination was ever mentioned.

Although Memmott says he never received Jamal's February 14, 2001, letter complaining for the first time of age discrimination, for purposes of this summary judgment motion, the court must assume the truth of Jamal's allegations. Therefore, Jamal's first protected activity took place on February 14, 2001.

The following were also protected activities: (1) Jamal's October 11, 2001, BOLI complaint alleging age discrimination and age discrimination retaliation; and (2) her April 1, 2003, BOLI complaint alleging age discrimination and retaliation, and retaliation for complaints of race discrimination.

## C. *Adverse Employment Action.*

As discussed above, Jamal has four adverse employment actions for purposes of her federal age discrimination and retaliation claims:

1. Magee's promotions of Hart and Estep in late December 2000.

2. Magee's promotion of Peterson in late December 2000.

3. Wilshire's hiring of Baker in January 2001 for the Heilig–Meyers collection manager position.

4. Wilshire's December 2002 failure to interview or hire Jamal for the two management positions for which she applied.

For state law purposes, Wilshire's December 12, 2000, promotion of Brown to manager of the foreclosure and bankruptcy departments is also an adverse employment action.

For the failures to promote to have been retaliations, they logically would have had to have occurred after Jamal engaged in her first protected activity, i.e., her February 2001 complaint. Because February 2001 was after the dates on which the promotions at issue here took place (one on December 12, 2000; two in late December 2000; and one in January 2001), Wilshire's alleged failures to promote Jamal could not have been in retaliation for complaints it first heard only after the promotions.

Thus, the only remaining adverse employment action is Wilshire's failure interview or hire Jamal in December 2002.

## D. *Causal Link.*

■ A plaintiff must show a causal link exists between the protected activity and the adverse employment action. *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir.1988). The causal link may be established by an inference derived from circumstantial evidence, such as the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision. *Id.* Thus, a causal link is typically demonstrated by the timing of the adverse action in relation to the protected activity, and the fact that the person who undertook the adverse action was aware of plaintiff's protected activity prior to taking such action. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982).

In the Ninth Circuit, "[c]ausation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge." *Miller v. Fairchild Indus., Inc.,*

797 F.2d 727, 731 (9th Cir.1986), *aff'd in part, rev'd in part on other grounds,* 885 F.2d 498 (1989) (en banc) (citations omitted). "That an employer's actions were caused by an employee's engagement in protected activities may be inferred from 'proximity in time between the protected action and the allegedly retaliatory employment decision.'" *Ray v. Henderson,* 217 F.3d 1234, 1244 (9th Cir.2000) (quoting *Yartzoff v. Thomas,* 809 F.2d 1371, 1371 (9th Cir.1987)). Thus, assuming Wilshire's failures to interview and hire Jamal for the December 2002 positions are actionable adverse employment actions for purposes of her age retaliation claim, Jamal then must establish a causal link between her complaints of age discrimination retaliation and the adverse employment actions.

This court concludes Jamal's claims have causal link and temporal proximity problems. She must show the adverse employment action (the December 2002 failure to hire) was *because* of her protected activity. As discussed above, Jamal's first protected activity was in February 2001 (nearly two years before the December 2002 failure to hire). She left Wilshire's employ in September 2001 (16 months before the December 2002 failure to hire). Her first BOLI complaint alleging age discrimination was in October 2001 (15 months before the December 2002 failure to hire). These periods between her protected activities and the December 2002 failure to hire are too long to support a causal link for purposes of Jamal's age discrimination retaliation claim. *See, e.g., Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (20 months between protected activity and adverse action established "no causality at all"); *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1068 (9th Cir.2002) (court found no temporal proximity when termination occurred 10 months after plaintiff filed her complaint); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (3–month period meant no temporal proximity); *Hughes v. Derwinski,* 967 F.2d 1168, 1174 (7th Cir.1992) (4–month period meant no temporal proximity).

Jamal's April 2003 BOLI complaint could not have been the cause of Wilshire's December 2002 failure to hire Jamal because it occurred after the failure to hire.

### E. *Conclusion.*

Jamal has not satisfied her burden of showing a causal link between the adverse employment actions and her protected activities.

### *Retaliation—Race Discrimination*

### A. *Legal Standard.*

Federal and state law prohibit retaliation against an employee because the employee has taken action to oppose discriminatory employment practices. 29 U.S.C. § 623(d); 42 U.S.C. § 2000e–3(a); Or.Rev. Stat. § 659.030(1)(f). A plaintiff may establish a *prima facie* case of discriminatory retaliation by showing that: (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. *Morgan v. National RR Passenger Corp.,* 232 F.3d 1008, 1017 (9th Cir.2000); *Wallis,* 26 F.3d at 888–89; *Harris v. Pameco Corp.,* 170 Or. App. 164, 178–79, 12 P.3d 524 (2000).

### B. *Discussion.*

Jamal asserts her protected activity for purposes of this claim occurred in June 2001 when she submitted a letter to Memmott as she left the workplace to go on disability leave for three months, from which she never returned. She now complains Wilshire retaliated against her for that complaint.

The court disagrees. The record establishes that the first time Jamal mentioned race discrimination retaliation was in her second BOLI complaint filed April 2003. Because none of the occurrences of retaliation about which Jamal complains occurred after her April 2003 protected activity, and they could not have been in retaliation for her April 2003 protected activity.

### C. Conclusion.

Wilshire's motion for summary judgment on Jamal's race discrimination retaliation claim is granted.

### Hostile Work Environment

Wilshire moves for summary judgment against Jamal's claims she was subjected to a hostile work environment in violation of Title VII and the ADEA.

### A. Legal Standards.

First, Wilshire states it is not clear, as a matter of law, if a claim for hostile work environment due to age is even available under the ADEA. Jamal responds that it makes no difference that Jamal's hostile work environment claim is for age, not gender, discrimination.

In any event, assuming such a claim would be available, to establish a *prima facie* hostile work environment claim, a plaintiff must raise a triable issue of fact as to whether her "workplace [was] permeated with discriminatory intimidation ... that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks and citations omitted); *Brooks v. City of San Mateo,* 229 F.3d 917, 923 (9th Cir.2000). The working environment must both subjectively and objectively be perceived as abusive. *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995).

Unlike a Title VII claim that is based on discrete acts of discrimination, a hostile work environment claim is based upon the cumulative effect of individual acts that may not themselves be actionable. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115–16, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In determining whether a hostile work environment claim exists that is actionable, the court looks to all the circumstances, including: frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.*

### B. Discussion.

Jamal contends she felt discriminatory conduct pervaded her work environment, after she complained in June and October 2000, and again in February 2001, about ongoing unlawful discrimination, harassment, and retaliation, to such a degree that she was unable to continue her employment with Wilshire. Thus, she has alleged sufficient facts to support the subjective portion of her hostile work environment claim. However, she has not alleged sufficient facts to support the objective portion of claim.

Using the *Harris* factors of frequency, severity, and intensity of interference with working conditions, this court cannot say that a reasonable woman in Jamal's position would consider the terms and conditions of her employment altered by the incidents of which she complains. Jamal's complaints range from the trivial, such as Magee failing to greet and make eye contact with her, to the routine, such as questions and disagreements about loan coding and foreclosure law. The record shows there was substantial workplace friction between Jamal and Magee. It is undisputed that Magee was a poor manager. How-

ever, there is no evidence Magee's conduct, or her favoritism of certain other employees, were motivated by age discrimination. "[N]ot all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII." *Meritor Sav. Bank v. Vinson,* 477 U.S. at 67, 106 S.Ct. 2399. The behaviors identified by Jamal and summarized in prior sections of this opinion, were typical workplace frictions and disagreements that are not sufficiently severe and pervasive to give rise to a hostile work environment claim, as a matter of law. *Manatt v. Bank of America, N.A.,* 339 F.3d 792, 804 (9th Cir.2003). Taken collectively, these circumstances are not sufficient to establish the working environment was objectively abusive. *Fuller v. City of Oakland,* 47 F.3d at 1527.

This court also notes the evidence in this record falls far short of the severity of conditions in cases where courts have allowed hostile work environment claims to proceed. *See, e.g., Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 817 (9th Cir.2002) (finding hostile work environment where employer verbally and physically abused plaintiff because of his race); *Nichols v. Azteca Rest. Enters.,* 256 F.3d 864, 872–73 (9th Cir.2001) (finding a hostile work environment where a male employee was called "faggot" and "fucking female whore" by co-workers and supervisors at least once a week and often several times a day); *Anderson v. Reno,* 190 F.3d 930 (9th Cir.1999), *abrogated on other grounds, Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (finding a hostile work environment where supervisor repeatedly referred to the employee as "office sex goddess", "sexy," and "the good little girl" and where he humiliated employee in public by drawing a pair of breasts on an easel while the employee was making a presentation and then told assembled group that "this is

your training bra session"); *Draper v. Coeur Rochester,* 147 F.3d 1104, 1109 (9th Cir.1998) (finding hostile work environment where plaintiff's supervisor made repeated sexual remarks to her, told her of his sexual fantasies and desire to have sex with her, commented on her physical characteristics, and asked over a loudspeaker if she needed help changing her clothes). *See also Vasquez v. County of Los Angeles,* 307 F.3d 884, 893 (9th Cir.2002) (no hostile environment where employee told he had "a typical Hispanic macho attitude" and should work in the field because "Hispanics do good in the field," and where he was yelled at in front of others); *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1111 (9th Cir.2000) (no hostile environment where supervisors referred to females as "castrating bitches," and "Madonnas" in front of plaintiff, and on several occasions directly called plaintiff "Medea").

Lastly, the evidence in the record indicates that Wilshire took adequate steps to address Jamal's complaints in June 2000 and June 2001. Wilshire initiated two prompt investigations of Jamal's complaints. The record also shows Wilshire recognized Magee had management problems, put her on an improvement plan, and then sought her resignation when she was unable to resolve the problems.

## C. *Conclusion.*

This court concludes Jamal has not alleged facts that, as a matter of law, show her interactions with Magee and her other job circumstances unreasonably interfered with her job performance or were sufficiently severe or pervasive to alter her conditions of employment and create an abusive working environment. Viewing the evidence in the light most favorable to Jamal, Magee's conduct, which may have been offensive and inappropriate, toward Jamal and others, did not so pollute the

workplace that it altered the conditions of Jamal's employment. Wilshire's motion for summary judgment on Jamal's hostile work environment claim is granted.

### Wrongful Constructive Discharge

Wilshire moves for summary judgment on Jamal's state law claim of wrongful constructive discharge.

#### A. *Legal Standards.*

A constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable and thus forces her to quit her job. *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343 (4th Cir.1995). A constructive discharge "occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'" *Brooks v. City of San Mateo*, 229 F.3d at 930. Further, a plaintiff seeking to pursue such a claim must show that she quit the job "under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir.1998).

#### B. *Discussion.*

Jamal argues Wilshire's repeated failures to promote her are enough "to take this claim to the jury." Jamal says once one adds evidence of the requirement that she prove herself as a manager in May 2001, without benefit of a title or pay raise; Magee's destruction of Jamal's e-mails that were proof of her managerial accomplishments; and Wilshire's refusal to do anything about the intolerable workplace conditions after Jamal gave Wilshire her June 2001 complaint and grievance, there is more than enough evidence to make summary judgment for Wilshire inappropriate.

■ This court disagrees. Jamal must show Wilshire intentionally maintained work conditions so intolerable that a reasonable person would quit, and that Wilshire did so because it wanted her to quit. *Doe v. Denny's, Inc.*, 327 Or. 354, 359, 963 P.2d 650 (1998). There is no evidence in the record that Wilshire intentionally maintained working conditions that were intolerable to Jamal. Again, the only evidence relating to that subject is that Wilshire engaged in two prompt investigations of Jamal's complaints, and that Wilshire recognized and tried to resolve Magee's management problems.

■ As discussed above regarding Jamal's hostile work environment claim, Jamal complaints that her working conditions were "intolerable" are not supported by the facts, even if Jamal's recitation of the facts is assumed to be true. Basically, the conditions here were that Jamal was unhappy with her circumstances at work. She felt she was being treated unfairly by Magee, and recites many instances of workplace friction and resentments. These conditions do not give an employee the legal right to throw up her hands and quit, and then sue her employer for, in effect, firing her. Constructive discharge requires a showing that the working conditions were not only tangible or adverse, but intolerable. As a matter of law, Jamal has not shown her working conditions at Wilshire were so intolerable that a reasonable person would feel she had no other choice but to resign.

#### C. *Conclusion.*

Wilshire's motion for summary judgment on Jamal's constructive discharge claim is granted.

### Wilshire's Motion to Strike Stoneking and White Declarations

Wilshire moves to strike the declarations of Pat Stoneking and Janice White, arguing Jamal and her counsel withheld information concerning these two potential witnesses until after the cross-motions for summary judgment had been filed. Jamal did not identify these witnesses with respect to the interrogatories Wilshire filed a year ago requesting she identify anyone who had any information related to her claims, and she did not supplement her answers to the interrogatories once she identified Stoneking and White as potential witnesses. Wilshire argues that the conduct of Jamal and her counsel violates Fed.R.Civ.P. 26(e), which requires supplementation of discovery disclosures, and exclusion of the affidavits is warranted under Fed.R.Civ.P. 26(e) and 37(c).

This court denies these motions. The court has considered the declarations of Stoneking and White in its decision to grant Wilshire's motion for summary judgment, even though neither declaration mentions either Jamal or Magee and both contain conclusions, speculation, and hearsay that may or may not be admissible at a trial.

### Jamal's Motion for Summary Judgment on Wilshire's Counterclaim

Jamal moves for summary judgment on Wilshire's counterclaim that she breached her confidentiality agreement with Wilshire. In addition to other arguments, Jamal says Wilshire's counterclaim is yet another form of post-employment retaliation against her for asserting her employment rights.

When Jamal was promoted to a manager's position in 1997, she signed a confidentiality agreement with Wilshire. The agreement provided that Jamal would "neither use nor allow any other person or entity to use any such confidential information or trade secrets." It also said that "[u]pon termination for any reason, Employee will retain no excerpts, notes, photographs or copies of any confidential information or trade secrets."

Jamal sometimes worked at home on her home computer, through which she had access to Wilshire's files. Jamal says although she was never notified, she believes her access to Wilshire's files was revoked after she went out on disability leave in June 2001, but, in any event, she did not access Wilshire's files after that date.

Jamal resigned in September 2001. After her resignation, Wilshire requested she return her Honeywell pass card, Honeywell access card, and building keys, but did not mention return of any confidential information or trade secrets in her possession. Jamal returned the items requested, and says had she been requested to do so, she would have returned the other material. Further, she asserts she provided all such material she had in her possession to Wilshire's attorneys when asked to do so, nearly two years after her employment ended, which was before Wilshire filed its counterclaim.

Jamal argues she at no time used or allowed any other person to use any confidential information or trade secrets she might have come into contact with during the course of her employment with Wilshire. Wilshire disputes this, arguing Jamal used the information by producing it in this litigation. Wilshire also argues whether or not she permitted others to use the information is immaterial to the fact that her retention of the material constituted a violation of the confidentiality agreement.

Wilshire disputes the facts relating to when and what Jamal provided to Wilshire, and asserts she did not cooperate with Wilshire's counsel in the return of all

confidential materials, which in turn forced Wilshire to file the counterclaim. Wilshire also asserts Jamal still has copies of some confidential documents, and that Jamal's counsel has told Wilshire's counsel that any such documents will be returned at the conclusion of this litigation.

Jamal also argues Wilshire suffered no damage as a result of any alleged breach of the confidentiality agreement, asserting that under Oregon law, damages are an essential element of a breach of contract claim. Wilshire disagrees, arguing it need not prove monetary damages to survive Jamal's motion and that proof of damages is not an element of a breach of contract claim in Oregon. Wilshire argues its breach of contract claim can be submitted to a jury without proof of actual damages because it could be entitled to at least nominal damages. Even so, Wilshire argues it can prove damages. It says it has an ethical and other obligations to protect the confidential data of its clients and customers and has been forced by Jamal to expend time and resources, including attorney fees, in retrieving that information from Jamal.

Jamal's motion for summary judgment is denied. There are genuine issues of material fact as to whether the confidentiality agreement was breached: *e.g.*, what materials Jamal retained, how long did she retain them, and what she did with anything she retained. Because the court has granted all of Wilshire's summary judgment motions, the court exercises its discretion by refusing to extend supplemental jurisdiction to Wilshire's state law breach of contract claim. *San Pedro Hotel Co. v. City of Los Angeles,* 159 F.3d 470, 478–79 (9th Cir.1998). The court therefore dismisses that claim for lack of jurisdiction. Because the statute of limitations has not run, Wilshire may refile its state law cause of action in state court.

### Conclusion

For the reasons set forth above, the court GRANTS Wilshire's summary judgment motion (doc. 53) as to Jamal's state and federal claims of age discrimination, age-based retaliation, race-based retaliation, hostile work environment, and constructive discharge.

The court DENIES Wilshire's motions to strike (doc. 76) the Stoneking and White declarations.

The court DENIES Jamal's summary judgment motion (doc. 48) on Wilshire's breach of contract counterclaim. In addition, the court declines to exercise supplemental jurisdiction over that state law breach of contract counterclaim.

Therefore, this case is dismissed in its entirety.

IT IS SO ORDERED.